WHEELER ET UX. V. DUNN ET UX.

1. RESCISSION OF CONTRACTS — ELECTION.— By bringing an action for damages for inducing plaintiff to enter into a contract by fraudulent representations, in a foreign court, plaintiff elects to affirm the contract, and cannot thereafter maintain a suit in equity for rescission.

2. WHEN WIFE NOT A NECESSARY PARTY IN ACTION TO RESCIND.— When a husband purchases real estate in his own name, paying part of the purchase price out of his own funds and property at time of the transaction, and the balance thereof is secured by the notes and trust-deed of his wife, such facts alone do not make the wife a necessary party to a suit brought by the husband against the vendor to rescind the contract on the ground of fraudulent representations.

*Appeal from District Court of Arapahoe County.*

THIS was a suit in equity instituted by Byron A. Wheeler and wife in the district court in January, 1889, against John C. Dunn and wife, for the purpose of having rescinded the sale by defendants to plaintiff Byron A. Wheeler, in May, 1888, of certain interests in mines situate in San Juan county. The complainant alleges fraud and misrepresentation practiced on him by defendant John C. Dunn, to induce him to make the purchase, the said defendant representing the mines to be very valuable, well knowing that they were practically of little or no value.

The complaint prays that the sale be rescinded, the moneys and property paid be returned, the securities given canceled, and for damages.

The defendants interposed as a third defense a special plea to the effect that the plaintiff Byron A. Wheeler, long prior to the institution of this suit, had commenced an action in his own name against these defendants, in the district court of Albany county, Territory of Wyoming, for the recovery of $19,500 damages alleged to have been sustained by him by reason of the same acts and transactions complained of in this case, causing an

attachment to be issued from said court and levied upon a large amount of property of the defendants; that defendants had appeared and answered to the merits of said action, which was still pending and undetermined in said court, wherefore they demanded the dismissal of the present proceeding, etc.

No reply was filed to this plea, and the court below held that its allegations must be taken as true, and that they showed an election on the part of the plaintiff, Byron A. Wheeler, to affirm the sale. It was therefore decreed that the complaint be dismissed without prejudice to any proceedings at law. Other facts are sufficiently stated in the opinion.

Messrs. L. C. ROCKWELL and BERTRAM ELLIS, for appellants.

Mr. J. A. BENTLEY and Messrs. TELLER & ORAHOOD, for appellees.

REED, C. The object of this suit was to rescind and set aside the sale and purchase of the undivided three-eighths of the property, on the alleged ground of fraud on the part of defendants Dunn and wife in making the sale by misrepresenting the condition of the mine and its value, and by the suppression of facts alleged to have been known by defendants and unknown by plaintiffs, whereby plaintiffs were misled and deceived in regard to the value of the property, and induced to pay far more than its worth.

In order to properly determine the questions presented, it becomes necessary to find from the evidence and attendant circumstances the relation of the parties to each other and the property over which the controversy arose, and the knowledge and opportunities of knowledge of the parties, respectively, regarding its value.

There are several pertinent facts about which there is no controversy: *First.* That plaintiff F. A. Wheeler

was from January, 1886, until the bringing of this suit, and for anything that appears still is, the owner of one-half of the mining property out of which this litigation arose, the defendants, or one of them, owning the balance until the sale of one-eighth was made to Kavanagh and the other three-eighths to plaintiff Byron A. Wheeler. *Second.* That the parties expended upon the property in the way of development during the year 1886 about $4,000, and in the year 1887 about $500. Most of the development is shown to have been made in the season of 1886, and Dr. Wheeler testified that he was there in person from about the 6th of July until some time in September, and returned again to it in the fall. There is no testimony of any importance in regard to mining operations in the early part of 1887, but it is shown that both plaintiffs were at the mine, through it and examining it, in August and September of that year. Dr. Wheeler in his evidence described the condition of the mine minutely and at length as it was at that time, and the careful manner in which the examination was made. He left for Denver the 6th of September. Some time prior to August, 1887, a contract was made by the parties jointly with one Frank Ingersoll, whereby he was to have a bond on the mine for $175,000, and was to mine from thirty to fifty tons of ore, and have the same hauled and treated as a test lot to determine its value. This mining and test were completed, according to the testimony of Dr. Wheeler, before plaintiffs left on September 6th, and he knew the results and the value of the ore. From the evidence the conclusion is irresistible that plaintiffs had, up to the last date mentioned, as full and complete information in regard to the character of the mine, the amount of ore exposed and its value, as defendants had or could have obtained. Later in this discussion we shall have occasion to show the assertion of such knowledge by both plaintiffs. Defendant John C. Dunn remained at the mine a short time after the plaintiffs

left. There was some controversy as to the length of time, but it seems to have been fixed by the evidence at about September 19th, not later than the 21st, when he came to Denver. It is not shown that he has since returned. It is in evidence that he only went into the mine once after the plaintiffs left. He fixes the date at from the 11th to the 14th of September, or about a week after plaintiffs left.

Prior to plaintiffs' leaving the mine, they, with Dunn, made a contract for a lease of the property to George Ingersoll and Bennett, by which they were to work the mine, paying the owners a royalty of twenty-five per cent. Bennett testified, and his testimony was undisputed, that they commenced work on the mine about the 10th of September. He said: "I saw Mr. Dunn at the mine once after that, — once after we commenced, — within a week." According to the evidence of Dunn, it was only from one to four days. The knowledge he obtained by that visit, made almost immediately after plaintiffs left (in regard to the condition of the mine), is shown to be all he had more than that possessed by plaintiffs.

The basis upon which the alleged fraud is predicated is: *First.* The alleged statement of J. C. Dunn, often repeated and reiterated, to plaintiffs, that at the time of his last visit "it looked about the same as when they were there." Or, in the language of Dr. Wheeler: "He said the mine looked about the same; in fact, that was the stereotyped reply to all such questions,— 'about the same as when we were there.'" *Second.* In effect, that such statement was known by Dunn to be untrue, and that he knew the ore had been worked out by the lessees, and that they had quit work before he left the mine, and that he concealed the fact from the plaintiffs, and fraudulently agreed or conspired with the lessees to conceal the fact from their knowledge.

If such a statement as charged was made and reiter-

ated, no testimony was introduced upon the trial to show that at the time of Dunn's visit the mine did not look about the same as when plaintiffs last saw it. The fact of such a statement having been made is not established. The only testimony in support of it is that of plaintiffs. It is not in proof that it was made to or in the presence of any one else. Dr. Wheeler testified to its having been made at his house at a meeting in the presence of Kavanagh, one of the owners of the property. Kavanagh testified that Dunn was not present at the meeting. Thereupon Dr. Wheeler was recalled, and retracted the statement, and fixed it as having been made at another time and place. Dr. Wheeler throughout his testimony adheres to his statement that Dunn made the statement shortly after his return, and continued to reiterate it in the same words, and with startling frequency, until the sale was consummated on the 19th of April, following. Mrs. Wheeler, the other plaintiff, testified that at their first interview with Mr. Dunn, after his return, "I turned to Mr. Dunn, and said: 'How did the mine look that day, when you were up?' (He had just told me he had been up there just before he returned.) He hesitated a moment, and then answered me something like this: 'Mrs. Wheeler, I thought it did not look quite as well the day I went up.'" Mrs. Wheeler then proceeds at length to explain what she thought he meant by it, which is unimportant, as the language is plain and the meaning unmistakable. Mr. Dunn testified: "I was once at the mine after Dr. Wheeler and Mrs. Wheeler left. It was between the 11th and the 14th of September. I know nothing about the working the ore out of the mine. I have not been in the mine since then. That is the last time I was on the ground. When I saw it last the ore showing was not as good as when Kimball and Frank Ingersoll was taking out that ore, and I so notified the doctor and Mrs. Wheeler."

It cannot be said that the fact of the making of the al-

leged statement by Dunn was established by the evidence.
The preponderance, if any, is against it.

(*a*) It is alleged in the complaint that Dunn remained
at the mine four weeks after plaintiffs left. The evi-
dence shows he only remained about two weeks or less.
(*b*) That at the time Dunn left he well knew Ingersoll
and Bennett had abandoned work on the mine, and sup-
pressed the fact from the plaintiffs. (*c*) That Ingersoll
and Bennett quit the mine about the time Dunn left
because there was no ore, and informed Dunn of the
fact, and Dunn suppressed it. (*d*) That Dunn, Ingersoll
and Bennett agreed to say nothing of the failure of the
ore in the mine, and that Dunn suppressed the fact that
Ingersoll and Bennett had abandoned their lease.

It is shown by the evidence that at the time Dunn left
the mine Ingersoll and Bennett were working it, and
taking out ore. Bennett testified that he came to Denver
and saw Dunn in the city before September 25th. That
they quit work on the mine the last of October, and that
the last ore — thirty-four sacks — was taken away from
the mine October 31st. In argument counsel attempted
to predicate the knowledge of Dunn that the ore in the
mine had been worked out and exhausted, and his con-
cealment of the fact, upon the evidence of Roberts, who
packed the ore from the mine, who said that some time
after the 20th of the month he met Dunn, who asked
him in regard to the ore with which his pack-train was
loaded. He said it was not Veta Madre ore, but was
Highland Mary ore, and, when asked by Dunn why he
was not loaded with the ore from their mine, he said
there was no ore there. The latter part of his testimony
is entirely ignored or overlooked. In cross-examination
he says that he did not refer to the fact of there being
no ore in the mine, but to the fact that there was no ore
at the mine for transportation on that day; and also adds
that he continued to pack ore at intervals from that

mine until somewhere from the 20th to the 30th day of October.

The last of the above allegations is not wholly unsupported by testimony, but is contradicted. That work had not been suspended at that time is shown above; consequently there could have been no agreement for conspiracy to suppress the fact. The lease had not been abandoned. It will be remembered that Ingersoll and Bennett entered the next work under a parol contract for a lease. Bennett testified that he came to Denver after Dunn left the mountains, and saw Dunn, the Wheelers and Kavanagh about the lease. This fact also appears in the evidence of plaintiffs and Kavanagh. Bennett also testified that on that occasion he wanted the royalty they were to pay reduced, and that he informed them that the mine was not looking as well as when they left, which fact is also testified to by Kavanagh. It also appears that Bennett came down in November to see about the execution of the lease, but for some unexplained reason no lease was made. At that time the lease had not been abandoned. Bennett said: " They did not know but what I was going to work it another year; we did not know but we would ourselves." It is unnecessary to say more of these allegations.

There are two or three other matters in regard to the condition of the mine after the owners left, in the fall of 1887, that should be noticed,— facts, if not of themselves sufficient to inform the plaintiffs in regard to the condition and character of the mine, certainly sufficient to put them upon inquiry, and cause an investigation which would have given them all the necessary information previous to the purchase in the following April. Although the lessees were to pay twenty-five per cent. royalty, Dr. Wheeler testified to his knowledge of the fact that they had quit work (although he places it at a date much earlier than it occurred), and says: "Ingersoll and Ben-

nett never paid any royalty." He also testified that Dunn received a letter from a Mr. Garber, a merchant near the mine, dated November 16th, that was shown to him (Wheeler) soon after its arrival, in which it was stated that Bennett and Ingersoll had quit work on the mine the last of October, had run in debt, and made a failure of it, and adds: "I do not know how the mine looks, but, from what I can understand, it looks about the same that it usually did." This shows not a suppression of facts from his co-owners by Dunn, but a desire to communicate all the information he obtained. If such had not been the case, the actual knowledge of the property by plaintiffs up to the time the lessees entered, taken in connection with the subsequent facts admitted to have been known by them, clearly rebuts the presumption that they were in the purchase actuated and misled by the alleged statements of the defendant.

In *Clapham v. Shillito*, 7 Beav. 149, Lord Langdale said: "Cases have frequently occurred in which, upon entering into contracts, misrepresentations made by one party have not been in any degree relied on by the other party. If the party to whom the representations were made himself resorted to the proper means of verification before he entered into the contract, it may appear that he relied upon the result of his own investigation and inquiry, and not upon the representations made to him by the other party; or if the means of investigation and verification be at hand, and the attention of the party receiving the representations be drawn to them, the circumstances of the case may be such as to make it incumbent on a court of justice to impute to him a knowledge of the result, which, upon due inquiry, he ought to have obtained, and thus the notion of reliance on the representations made to him may be excluded." See, also, *Lowndes v. Lane*, 2 Cox, 363; *Pickering v. Dowson*, 4 Taunt. 779; *Jennings v. Broughton*, 17 Beav. 234. In *White v. Seaver*, 25 Barb. 235, the court says: "A pur-

chaser is bound to exercise ordinary prudence and discretion, and if the means of knowledge  *  *  *  are within his power, and he neglects to make the proper inquiry, he loses his remedy against the vendor for any fraudulent representations the latter may make." Same point, *Bell v. Byerson*, 11 Iowa, 233; *Burton v. Wellers*, Litt. Sel. Cas. 32.

In order to properly examine all the questions presented on this branch of the case, it is necessary to state the general principles of law applicable. It is said in Bigelow on Frauds, 466, that a fraudulent misrepresentation is made up of five elements: (1) A false representation. (2) Knowledge by the person who made it of its falsity. (3) Ignorance of its falsity by the person to whom it was made. (4) Intention that it should be acted upon. (5) Acting upon it, with damage.

An action at law for damages for deceit requires all these elements. In equity a case may be made without the second, and sometimes without the fifth. Very nearly the same enumeration of the elements going to make up a fraudulent misrepresentation is given in 2 Pom. Eq. Jur. 357. Regarding the character of the alleged misrepresentation it is said: "The real consideration is whether of itself the representation is such as would be apt to induce action on the part of the average man." See Bigelow, Frauds, 470. In *Smith v. Corporation*, L. R. 28 Ch. Div. 7, Lord Justice Bowen said: "In a case where the facts are equally well known to both parties, what one of them says to the other is frequently nothing but an expression of opinion;  *  *  *  but, if the facts are not equally known to both sides, then a statement of opinion by one who knows the facts best involves very often a statement of a material fact."

Probably the most clear and comprehensive statement of the elements necessary to constitute a fraudulent misrepresentation is given in Kerr, Fraud & M. 73, 74, where it is said: "In order that a misrepresentation may sup-

port an action at law, or be of any avail whatever as a ground for relief in equity, it is essential that it should be material in its nature, and should be a determining ground of the transaction. The misrepresentation must, in the language of the Roman law, be *dolus dans locum contractui.* There must be the assertion of a fact on which the person entering into the transaction relied, and in the absence of which it is reasonable to infer that he would not have entered into it at all, or at least not on the same terms. Both facts must concur. There must be false and material representations, and the parties seeking relief should have acted upon the faith and credit of such representations. To say that statements are false is one thing; to say that a man was deceived by them to enter into a transaction is another thing. A misrepresentation, to be material, must be one necessarily influencing and inducing the transaction, and affecting and going to its very essence and substance. * * * A misrepresentation goes for nothing unless it is a proximate and immediate cause of the transaction. It is not enough that it may have remotely or indirectly contributed to the transaction, or may have supplied a motive to the other party to enter into it. The representation must be the very ground on which the transaction has taken place. The transaction must be a necessary, and not merely an indirect, result of the representation." This was cited and quoted with approval in this court in *Improvement Co. v. Cowan,* 5 Colo. 320, and a portion of it in *Adams v. Schiffer,* 11 Colo. 28. See, also, Kerr, Fraud & M. 75–77; 2 Add. Cont. 772; 2 Pars. Cont. 769, 771; 2 Pom. Eq. Jur. §§ 879, 884; *Jennings v. Broughton,* 5 De Gex, M. & G. 126; *Smith v. Richards,* 13 Pet. 26; *McDonald v. Trafton,* 15 Me. 225; *De Manneville v. Crompton,* 1 Ves. & .B. 354; *Canal Co. v. Emmett,* 9 Paige, 168; *Pulsford v. Richards,* 17 Beav. 87; *Hough v. Richardson,* 3 Story, 690; *Clark v. Everhart,* 63 Pa. St. 347; *Veasey v. Doton,* 3 Allen, 380.

Courts of equity, in this class of cases, in order to determine how far the purchasing party was influenced by the alleged misrepresentation, or, in the language of the authorities, "determine whether the alleged misrepresentations were the inducing cause of the transaction," look not only to the knowledge of the respective parties and the materiality of the statements, but also to the surrounding circumstances and the object or motives of the purchaser, so far as they appear or are deducible from the evidence or the established facts.

It is stated by one witness, in speaking of the Veta Madre mine (the one in controversy): "It was considered a wonderful thing. Prof. Hayden gives at least two· pages describing it. It has made a good deal of talk in that country." He said of the ore, after describing the width of the vein: "It was in small chunks, disseminated through the vein, from the size of a bean or marble up to three or four inches square." Mr. Wheeler, in his testimony, in speaking of the mine, said it was fifteen feet between walls, interspersed with the ore;" and of the character of the ore, and necessity of concentration, "that they thought it would probably go, without any selection at all, twenty tons into one; that it would be an easy matter to sort it down to twelve, and easier still to six, into one, when its value would be at least $200 a ton for the concentrates." It appears that plaintiffs, or at least Mr. Wheeler, early realized the low grade of the ore by reason of its dissemination in small quantities through a large amount of gangue, and the necessity of concentrating it. He testifies that in the fall of 1886 he went back to the mine expecting to do considerable in putting up the concentrating mill at that time, and that he had been in Denver to raise money to prosecute the work. Dunn thought it too late in the season, and he acquiesced. It is evident, though perhaps inferentially, that in the fall of 1887 he was more fully impressed with the necessity of having concentrating works in connec-

tion with the mine; and that the Dunns, from want of
capital or other reasons, declined to go into it.   It is es-
tablished by the testimony that after the return of the
parties to Denver, in the fall of 1887, efforts were made
to get Dunn out of the concern by sale of their interest,
and get others interested who had the capital and dispo-
sition to carry out the plans of the plaintiffs.   Whether
this originated with plaintiffs or defendants, or with
both, is not clear; probably both.   In regard to defend-
ant Mrs. Dunn, who held the legal title, Mrs. Wheeler
testified: "Never had any conversation with Mrs. Dunn
of a business kind, except that she might possibly be in
the room.   She was an invalid, and usually lying down.
Mr. Dunn and myself would talk in her presence.   She
never expressed herself in any way, except to say: 'Do
something with the mine, and get me out of here, for I
am sick; I want to go away.'"

This is all the evidence in regard to her participation
in the affairs.   That the Dunns were willing and anxious
to sell is inferable; that plaintiffs were anxious they
should sell is well established by their own testimony.
To carry out the project and secure a mill, the parties
entered into negotiations with Terry & Jessup, whereby
they (Terry & Jessup) were to buy Dunn's interest in the
mine, and a portion of the Wheeler interest, for $75,000;
they to put up a concentrating mill, and plaintiffs to build
a tramway to offset the cost of the mill.   This arrange-
ment or negotiation was entered upon some time in the
early winter of 1887, and resulted in a contract whereby
the purchase was to be made and the mill and tramway
built.   Terry was the mill man and Jessup supposed to
be the capitalist.   He was to make the first payment on
the property in May.   He failed to get the money, and
the scheme for selling was abandoned, and he dropped
it.   The arrangement for the retaining of Terry and the
building of the mill continued; hence it became neces-
sary to buy out the Dunns.

In speaking of the purchase of the Dunn interest by Wheeler, he (Wheeler) says: "At the time the negotiations were pending about these horses was the first I seriously entertained it; and then that was not to retain it, but only to tide over, so that Mr. Terry should come into it instead of Mr. Dunn; and then I consented to take the part, together with my wife. That was the fore part of 1888; I can't fix the month. * * * It came about this way: Because Mr. Terry's agreement was to do the buying of Mr. Dunn's part, and then, when Mr. Terry failed to get the money, Mr. Dunn comes and tries to have us go through with this trade of horses, stating that he could dispose of them for $20,000. * * * He (Terry) was to put up the mill and operate it and take an interest in the mine. That fell through with, in so far as Mr. Terry was unable to raise the money in the agreed time; and the whole thing would fall through, unless we took it and tided him over until such time as he could get the money; and Mr. Dunn's proposition was that he would take the horses, if he would do so, as part payment, and we were then to be in partnership with Terry, Dunn to be out. Terry was to have a fourth interest, and the other three-fourths would be held between Mrs. Wheeler and myself. Dunn was to take the horses from us in part payment for his interest. I first commenced to think of buying Dunn's interest when I found this arrangement could be made. Mr. Terry dropped out of relationship to the title because he failed to get the money. Then I stepped in and took these horses, and the contract was made by which the title of the property passed to me. * * * It did not finally turn out that Terry was dropped until the mine was known to have no ore in it. When I took the deed I expected Terry to go in with me. He was to put up the mill, complete. I was to put up a tramway; and when he had furnished the mill and the other considerations that were to be paid, then he was to receive his title. I first begun seriously

to think of buying this property after we found out that Mr. Terry couldn't raise the money on time; was willing to consider it seriously, in order that the mill might be on the property and make it of value, as it was supposed to be a large vein of concentrating ore. The idea was, if Mr. Terry would put up a big mill, it would be a profitable venture to buy the property, if it were as it had been represented to us — the same as when we saw it last. In the same connection we attempted to acquire Kavanagh's one-eighth at about $17,000. This was after we had ascertained Dunn's price."

Mrs. Wheeler testified: "The inducements which led us to make the contract with Dunns were to save the entire deal from falling through, as I understand it,— to take Jessup's place."

It becomes apparent from the foregoing that whatever statements were made, if any, prior to March, 1888, could not have been made for the purpose of influencing the plaintiffs, but Terry and Jessup, and whatever influence they could have had could only have been by their reiteration after that time. That plaintiffs did not rely upon the statements of the defendant in regard to the value of the property, to their injury, is apparent from their own testimony. It appears from the testimony of Dr. Wheeler that, long prior to the alleged statements, he offered to exchange certain property in Denver, of the estimated value of $40,000, for the interest of Dunn. It also appears from the testimony of both plaintiffs that while the negotiations with Terry and Jessup were pending, the parties got together and proceeded to work out on paper the value of the ore exposed in the mine by the actual development on the date of the last visit of plaintiffs on September 6th. The conclusion was unanimously reached that allowing twenty tons to be concentrated into one, and the concentrated ton to be of the established value of $200, the value of the ore exposed was from $40,000 to $50,000. This was testified to by both plaint-

iffs and by Mrs. Wheeler with great minuteness and detail. She said: "During the time of negotiation for the sale, which in the first place was supposed to be to Terry and Jessup, but afterwards turned to Terry and Wheeler, we were weighing in our minds whether it would be possible or safe to accept the terms that Mr. Dunn had given us in regard to payments, and to put in certain machinery that would be necessary to make the mine pay. We were all sitting in our parlor — Mr. Dunn, my husband and myself — talking over the matter. My husband was inquiring of him, from his mining knowledge, how many cubic feet of that ore standing in that wall he thought it would take to make a ton of concentrates. This was a few days before we concluded the deal, but while we were weighing it, and determining whether we had better do it or not, or give it up or not; and I forget the exact number they concluded it would take, but the dimensions of the ore body I remember distinctly. They calculated on the basis of fifteen feet wide, twenty-five feet high, and Mr. Dunn suggested he thought twenty-five feet would hardly cover it, because that was only up to the collar of the shaft, and as we entered the mountain the ore body, he thought, would go nearer the surface; so they based their calculation on twenty-five, and then something like forty or forty-five feet on the Maroney drift, as they calculated some had been taken out of the original forty-seven feet, and, of course, they made some calculations for that, and after the calculation was all completed they made out there was from $40,000 to $50,000 worth of mineral standing in that body. There was no dispute between the parties as to the width and size of the ore. We all agreed. We had all seen it, and we all agreed. The only thing we didn't know — it was taken out; and he did. We didn't know the ore-bed was taken out. We agreed as to the dimensions, and the only question was to calculate how much mineral was standing in the wall in that body at that time upon which

we could base our calculations as to its being safe to invest."

It is also in evidence, by the testimony of both plaintiffs, that defendant Dunn was reprimanded by Dr. Wheeler for a statement made to Terry wherein he was supposed to have underestimated the value of the exposed ore and size of the mine. The testimony of both is essentially the same. Dr. Wheeler said: " I have not told all the language used by Mr. Dunn. At the first meeting with Mr. Terry Mr. Dunn described the mine, saying: ' We have twelve feet that will go six into one.' I spoke up and said: ' Why, Mr. Dunn, it is just as bad to lie under as to lie over. If you know the vein is fifteen feet feet wide it is just as bad to say that it is twelve as to say that it is twenty;' and he said, ' Well, I would rather put it mildly, so as to have people agreeably disappointed.' I thought he was not telling the truth. I thought the vein was fifteen feet at the shaft."

It is apparent that the conclusions reached in the above matters were not reached through or by reason of any representations made by the defendants, but from well-established *data*, as they supposed, in the possession of plaintiffs, about which, it was conceded, there could be no controversy. The supposition that it was a united effort on the part of all the parties to mislead Terry could not be entertained, as it is rebutted by the subsequent conduct of the plaintiffs. We are bound to conclude that it was a clear case of self-delusion or deception, and the exaggerated estimate of the value of the mine and the amount of ore exposed, from what was supposed to be correct *data*, was so at variance with results and subsequent facts as to clearly establish this conclusion.

By putting twenty tons of crude ore into one the value of the ore was fixed at $200; consequently the value of one ton of crude ore was $10. To produce $40,000 would have required four thousand tons. To have mined it out between the 10th of September, when lessees commenced

work, and the 20th, when Dunn left, as alleged, would have required the mining and packing, and transportation on asses, of four hundred tons per day. The inconsistency of the two assumed positions is apparent. There is no evidence that Dunn was not equally deceived, and the fact that he took security for the purchase money to the extent of $30,000 on the one-half of the same mine might tend to establish this view of his confidence in the value of the property.

It is in evidence by Dr. Wheeler, that, by a visit to and an examination of the mine, he learned of the alleged fraud in the latter part of May, 1888. It is a well-settled rule of law that a party wishing to rescind must do so at once, on learning of the fraud. If he does not do so, he will be held to have affirmed the transaction. To avoid this conclusion it is alleged in the complaint "that, immediately upon plaintiffs discovering the fraud practiced upon them, they at once set about attempting to find proof, if possible, that said Dunn knew of the condition of said mine when he left there, in the fall of 1887. That owing to the fact that men who knew the facts as to the condition of said mine were scattered, and to the further fact that they were indisposed to give information upon said point, although questioned and requested so to do by said plaintiffs, plaintiffs failed to get any tangible testimony upon that point until about the middle of July, 1888, when plaintiff Byron immediately returned home from said mine, and proceeded to tender said deed hereinbefore stated."

An examination of the record will show that if he, as stated, succeeded in finding such testimony, he neglected to avail himself of it upon the trial, as before shown. No attempt was made to prove the facts by Bennett and others who testified, and, as will be seen by the examination of the record, the alleged worked-out, depleted and worthless condition of the mine after lessees quit work rests entirely upon the evidence given by Mr.

Wheeler. These facts were not attempted to be proved by Bennett, Terry, or others who had good opportunities for knowing them.

We have reviewed this part of the case at great, and perhaps unnecessary, length; but the amount involved, and its importance to the parties, as well as the necessity of a thorough examination of the pleadings and evidence for a proper application of the law, seemed to render it necessary. We are clearly of the opinion that plaintiffs failed to establish the allegations in the complaint, and make a case warranting a decree of rescission. There can be no doubt that the plaintiffs paid more than the value of the property (if the evidence is reliable), and the transaction may be financially disastrous; but courts cannot relieve against the carelessness, inattention or self-deception of parties. "A failure in a speculation does not constitute ground for relief." *Turner v. Navigation Co.* 2 Dev. Eq. 236. For these reasons the case should have been dismissed.

The suit at law in Wyoming was brought previous to the bringing of this. Was at that time pending and undetermined. There had been no adjudication. There was no judgment. The attempted rescission of the contract of sale was on July 27th, by the acts of plaintiffs. The following day the suit for damages was instituted in Wyoming for the alleged fraud and deceit. This suit was brought subsequently to rescind by decree of court. The bringing of the suit at law after the attempted rescission was a tacit admission that there had been no legal rescission by the acts of the parties that could be so regarded and sustained in the courts. The object of the plaintiffs on the 27th of July, and in this suit, was to disaffirm the contract of purchase. The legal effect of the action at law was to affirm it. In Bigelow, Frauds, 65, it is said: "If, however, two proposed proceedings are inconsistent, the law will allow but one of them. If the two are pending at the same time, the law will re-

quire the plaintiff, at the instance of the defendant, to elect between the two, and the election, if made with knowledge of the facts, will be conclusive. &ast; &ast; &ast; What remedies are inconsistent? The following may be stated: An action for damages for the fraud by which the defendant has induced the plaintiff to enter into a contract the fruits of which the plaintiff retains, and an action based upon rescission; the former would treat the contract as binding, while the latter would repudiate it as invalid. On the other hand, if a proceeding is instituted for the purpose of effecting a recission of the contract, no action for damages involving the existence of the contract can be maintained."

In *Jewett v. Petit*, 4 Mich. 511, the court says: "One who has been induced to enter into a contract by the fraudulent representation of the other party may, on discovery of the fraud, disaffirm the contract. He has his election in the first instance, but it is well settled that he cannot do both. The assertion of the right to affirm is a renunciation of the right to disaffirm, and *vice versa*." In 2 Add. Cont. 777, it is said: "And whenever a party to a contract has a right to elect whether he will avoid it, or treat it as a subsisting contract, his election may be manifested by acts as well as by words, and when once made is final, and cannot be retracted." The theory of the law seems to be that the two proceedings are inconsistent, incompatible and contradictory, and this position is further sustained by the following authorities: Com. Dig. "Election," ch. 2; *Ward v. Day*, 33 Law J. Q. B. 13; *Selway v. Fogg*, 5 Mees. & W. 83; *Strong v. Strong*, 102 N. Y. 69; *Bowen v. Mandeville*, 95 N. Y. 237; *Moller v. Tuska*, 87 N. Y. 166; *Mallory v. Leach*, 35 Vt. 156; *Heastings v. McGee*, 66 Pa. St. 384; *Whitney v. Allaire*, 4 Denio, 554.

The court properly concluded that plaintiff Wheeler, by bringing his action at law after the attempted rescission of July 27th, had made his election, abandoned his

right to rescind, and had proceeded to affirm the contract, sue for damages and attach the horses as the property of defendants. The inconsistency and incompatibility of the two cases are apparent at a glance. If there was a rescission *in pais* on the 27th, the horses were his own property. If, in response to the prayer in this case, the court had decreed a rescission, the horses then would have been his. By his act in attaching the same horses he declared them to be the property of defendants. This, according to the authorities above, was an affirmance; and the court was warranted in so finding, and that the plaintiff had made his election. He could not affirm in Wyoming and rescind in this state. Having selected the forum and elected a remedy fully as adequate, and perhaps more so, than this, to afford all the legal relief to which the plaintiff could be entitled, he should be confined to that suit.

It is contended by counsel that the court erred in dismissing the suit on the third plea of defendants, for the reason that the suit in Wyoming was by Mr. Wheeler alone, while the suit here was by both himself and wife. We are not aware that the leaving out of one plaintiff in Wyoming or adding one here is a matter of very grave importance. If Mrs. Wheeler was a necessary party in Wyoming, the failure to put her in could probably have been corrected in the course of the proceeding. If unnecessarily made a party in this suit, it being in equity, no harm could be done. The identity of suits can only be determined by the subject-matter of the controversy. In this instance there can be no question of identity. To hold otherwise would allow the same controversy to be litigated in several different courts at the same time simply by adding parties at the will of counsel; but, as counsel seems to rely upon the point, we will attempt to determine whether she was a necessary and indispensable party in this suit. Whether she was in the Wyoming suit must be determined by that court.

There is no allegation of conveyance, or contract for the conveyance, or of any agreement between the plaintiffs whereby Frances A. Wheeler had, or was to have, any interest in the property conveyed to her husband. For all that appears in the pleading or evidence, the debts due and owing from defendants, which were made a part of the consideration paid, were debts due the husband. The debts owing by defendants, and others assumed to be paid, were assumed by him. The cash payment of $2,500 was made by him. The title to the herd of horses in Wyoming was shown to have been in him, and the transfer to have been made by him to defendant John C. Dunn. The supposed *status* of Frances A. is badly defined and indefinitely described by counsel for plaintiffs, both in pleading and in argument. It is true, counsel alleges them to be husband and wife; but, under our laws, where the wife is allowed to manage her own property, and contract in regard to it as though she were a *feme sole*, and buy, take, hold and convey real property, the relations of husband and wife in regard to property, other than that used for a home, are very different from those existing at common law; and the transactions between them in regard to matters of property are treated much as if the relation of husband and wife did not exist, and as if the transactions were between other individuals. It is true, counsel treat them all the way through, and speak of them, as being partners or tenants in common of the realty, or, at least, of having common and identical interest in the matters in controversy; but this assumed position and community of interest can hardly be sustained, in the absence of allegation and proof of the ownership of the real property in controversy, and the personalty that went in part payment of the purchase; and the relation of the parties to the subject-matters of the suit must be determined by the same rules of law that control parties where no such relation exists. It is in proof that the purchase was made

by the husband; the conveyance was to him; but by some arrangement between the plaintiffs, the terms of which are not disclosed, Frances A. executed the two notes of $15,000 each, and she executed a trust-deed upon her individual property (the other half of the mine) to secure them, and such notes were delivered by the husband to the defendants for such part of the purchase price. This, of itself, amounts to no more than if she became his surety or loaned her money, property or credit to him. This would give her no interest in the real property so that she could rescind or enforce a contract in regard to it. It is hardly necessary to say that interests in such property cannot be created by parol. The transaction, as disclosed, could not make the husband trustee for the wife, and on no other theory could the claim of interest in the wife be sustained.

In 1 Perry on Trusts, § 133, p. 149, it is said: " There must be an actual payment from a man's own money, or what is equivalent to payment from his own money, to create a resulting trust, and the money must be advanced and paid in the character of a purchaser; for if one pay the purchase money by way of loan for another, and the conveyance is taken to the other, no trust will result to the one who thus pays the purchase money." To same point, *Bartlett v. Pickersgill,* 1 Eden, 516; *Crop v. Norton,* 9 Mod. 235; *Dudley v. Bachelder,* 53 Me. 403; *Wheeler v. Kirtland,* 23 N. J. Eq. 13; *Tunnard v. Littell,* id. 264; *Page v. Page,* 8 N. H. 187; *Reeve v. Strawn,* 14 Ill. 94. In *White v. Carpenter,* 2 Paige, 217, 265, it is said: " Such a trust cannot be raised in favor of a person by the mere payment of the purchase money, if it is not the intention of either party that the legal estate should vest in him. The office of a resulting trust is to carry into effect the intention of the parties, not to defeat that intention." Citing and approving *St. John v. Benedict,* 6 Johns. Ch. 111, where the whole question of a resulting trust is elaborately discussed by the learned chancellor.

It is clear that the transaction was not such as to make the husband a trustee for the wife; hence it follows that she was not a necessary and indispensable party to this suit.    True, her notes and trust-deed were out, but, on a rescission of the contract by the acts of the parties or a decree of the court, they would have been returned to Byron A., from whom they were obtained, and they (the husband and wife) could have adjusted the matter as they saw fit.    The decree dismissing this suit should be affirmed.

I concur: PATTISON and RICHMOND, CC.

PER CURIAM.   For the reasons stated in the foregoing opinion the judgment of the court below is affirmed.
                                                *Affirmed.*

ON PETITION FOR REHEARING.

PER CURIAM.   The judgment of the district court against plaintiff was based exclusively upon the third defense, which was that plaintiff had elected not to rescind the contract.   By affirming this judgment parties are left at liberty to prosecute or defend any other kind of action or proceeding in reference to the subject-matter of this litigation, as they shall be advised.   In any such action or proceeding neither the finding of the district court upon the evidence, nor the discussion and conclusion thereon by Mr. Commissioner REED, shall prejudice the rights of either party.   The judgment of the district court is accordingly affirmed, the former opinion *per curiam* is modified, and the petition for rehearing is denied.
                                       *Rehearing denied.*