[No. 3954.]

## MOORE V. CARRICK.

1. FRAUD—*Rescission of Contract for.* Where, in an equitable action to rescind a contract, actual and intended fraud is relied upon, the same rules apply as in actions at law for deceit. (103)

2. —— *Definition.* Actionable fraud is the false representation of a material fact, as distinguished from opinion, made with knowledge of its falsity, or recklessly, without belief in its truth, with intent to induce action by the complaining party, and accepted and acted upon by him, as true, to his injury. (104)

The statement of one offering corporate shares for sale or exchange, that "the stock is good so far as I know," he having no peculiar means of knowledge as to the matter, is a mere expression of opinion, and not to be relied upon as a representation. (105)

3. —— *False Representations Not Relied Upon,* by the party to whom they are made, he making independent investigation, affords no action, except in cases of active fraud or concealment, or when fiduciary relations exist, or where peculiar knowledge on the part of the one making the representation is shown. (106)

4. APPEALS AND WRITS OF ERROR—*Finding on Conflicting Evidence—Depositions.* Where all material evidence for the successful party is by deposition, the court of review is not governed by the usual rule that findings upon conflicting evidence are conclusive. (107)

5. —— *Judgment.* Plaintiff sued to vacate a conveyance of lands, on the ground of actual and intended fraud. A decree in his favor reversed without prejudice to another action on the ground of mutual mistake. (108)

*Error to Mesa District Court.* HON. SPRIGG SHACKELFORD, Judge.

MESSRS. FRY & WELCH, MESSRS. ROTHGERBER & APPEL for plaintiff in error.

MR. SOLON T. WILLIAMS for defendant in error.

KING, J., delivered the opinion of the court.

This action was brought by Herbert L. Carrick, defendant in error, to obtain the cancellation of a deed by which he conveyed to Thomas B. Moore, plaintiff in error, twenty acres

of land situated in Mesa county, Colorado, for which he received from said Moore ninety shares of the capital stock of The Hudson's Bay Mutual Fire Insurance Company of Vancouver, a corporation organized under the laws of British Columbia. The complaint alleges that the deed was procured by the defendant through his fraud, and through the fraud and conspiracy of defendant and the said insurance company; that the defendant falsely and fraudulently represented to the plaintiff that the said stock was good stock, was worth $110 a share, and that he had paid $110 a share for the same; that the officers and agents of said company, and the defendant, conspiring to cheat and defraud plaintiff, falsely and fraudulently represented to plaintiff that the stock was good stock and worth the sum of $110 a share; that defendant knew such representations were false, and made the same for the purpose of defrauding plaintiff out of his land, and that plaintiff relied upon said false and fraudulent representations, believing the same to be true, and so believing and relying, accepted defendant's offer, and on March 4, 1911, in consideration of said stock, made, executed and delivered the deed; that the said company, at the time of the signing of said deed, was totally insolvent, and that the stock was and is of no value.

The answer admitted the exchange of the land for the ninety shares of stock mentioned in the complaint, and denied each and every other allegation of the complaint.

The evidence on the part of the plaintiff is substantially as follows: Plaintiff and defendant had no conversation or communication, were not acquainted and had not met each other, until long after the transaction in question; plaintiff was a resident of Seattle, defendant of Vancouver, but was doing business in both Vancouver and Seattle as a broker, and buying and selling lands and stocks on his own account. George L. Estes was a resident of Seattle, engaged in the general brokerage business. About February 24, 1911, Estes overheard a conversation between Moore and the Sunset

Realty Company, in which Moore mentioned that he had for sale or trade some stock in the insurance company. Estes followed Moore out of the office, and a conversation took place between them on the street, in which Estes stated that if the stock was good, he thought he might be able to handle some of it, in answer to which Moore said, "You assure yourself that it is all right, and then if you want to make the deal, all right," and suggested that he inquire of the president of the insurance company, and of brokers in Vancouver. At that time, and perhaps about the 27th also, Moore stated that the stock was good, was worth $110—that he had paid that for it. On the 27th of February, Estes procured from Moore, or from his certificate of stock, the name of the president, and sent the telegram and received the following answer:

"Seattle, Wash., Feb. 27, 1911.

Chas. W. Jennings,
        Dominion Trust Building, Vancouver, B. C.

What is stock Hudson Bay Mutual Fire worth? What price can it be cashed? Send full particulars.

        (Signed)   GEO. L. ESTES, 1258 John St."

"Vancouver, B. C., Feb. 27, 1911.   6:12 P. M.
G. L. Estes, 1258 John St., Seattle.

Hudson Bay Fire has no more stock for sale. Vancouver brokers paying 110 per share.

                CHAS. W. JENNINGS, President."

About the same time, Estes began to talk with Carrick relative to purchase of the stock. Estes showed the telegram to Carrick, and told him that it sounded good. Both Estes and Carrick went to Vancouver personally to investigate the company and the stock. Estes examined the articles of incorporation, and found that the company was incorporated for $100,000 "guaranteed" stock, so called. He examined the law under which the company was incor-

porated, and came to the conclusion that under such law its capital stock was insured or guaranteed, and inquired of the president of the company and of the cashier of some bank as to its value. Plaintiff had a personal interview with Jennings, president of the company, who told him, and also Estes, that the stock was worth 110 and would be worth more. The conversation between the president and Carrick was on March first. Prior to that time, Carrick, or Carrick and Estes, had secured twenty-six shares of the stock, which plaintiff then offered to sell at par, and took back to Seattle a letter from Jennings, addressed to Estes, dated March first, stating that a man named Allen would take the stock at par, and had deposited a check for $100, and directing Estes to send the stock and draft through a bank in Seattle. This offer was accepted. Thereafter, Estes met Moore, and stated that he could get some fruit land in Colorado for shares of the stock, to which Moore replied, "All right, he would consider anything of the kind if we" (meaning Estes and his client, Carrick) "were satisfied that the stock was all right." Estes told Moore that the proposition was for fruit land in Colorado—twenty acres at $500 an acre. After some negotiations between Carrick and Moore, carried on entirely through Estes, the trade was closed. Estes delivered the deed to Moore and received the stock on or about March fourth. It is shown that at about the time of the foregoing transaction, the Dominion Investors' Corporation, Limited, was attempting to secure, and did secure, a majority (more than $50,000) of the capital stock of said company, for the purpose of obtaining control of the corporation; that they traded property at their market price for the stock at par value, and that other trades were made for the stock at or about the same time; that about November, 1910, one James Ball traded a house to defendant for thirty shares of the said stock, and that Ball got in communication with Moore through an advertisement which stated that the advertiser had some good commercial stock to exchange for a house, and to apply at a certain telephone number, which

thereafter appeared to be the telephone number of the insur-
ance company. It further appeared that some time after the
transaction between the plaintiff and the defendant was con-
cluded, the persons who had secured a majority of the stock
demanded a statement from the president of the company,
and began investigations of its conditions, preparatory to tak-
ing charge, whereupon the president fled. Upon such inves-
tigation, no assets or books could be discovered. The presi-
dent was arrested, tried, convicted for swindling, and sent
to the penitentiary. Ball caused the arrest of Moore as a
conspirator with the company. Upon trial before the county
court in Vancouver, at which both Carrick and Estes testified
for the prosecution, Moore was acquitted, a transcript of their
evidence at that trial being in evidence here. All the evidence
upon the part of the plaintiff in this case is by deposition, or
transcript as aforesaid, with the exception of one witness as
to the value of the land. Neither Carrick nor Estes testified.
nor does it otherwise appear, that the statements made by
Moore to Estes, relative to the stock, were communicated to
Carrick. Neither of them testified that Carrick relied upon
such statements, or any of them. The transcript of Estes'
testimony before the county judge shows that while Estes was
under examination, the following questions were asked and
answers made:

"Q. At any rate, he (Moore) left it to you to make
your inquiries about the stock in Vancouver? A. Yes.

Q. You did investigate it? A. Yes.

Q. And it was not from anything he said to you that
you recommended the deal to your client, but rather from
what you learned from Mr. Jennings' telegram, or some other
source? A. That's right."

And in his deposition:

Q. But I mean Mr. Moore left it to you to investigate
the value of the stock, didn't he? A. He told me to investi-
gate it, yes.

Q. And it was not from what Moore told you, but rather from what you got from Jennings, and what Mr. Carrick found out, that you relied on in making the deal? A. It only backed up what Mr. Moore had already said in regard to the stock—that it was good—that part of it; but I didn't particularly go into the proposition until I investigated both ends of it, you understand. I could tell you that stock was good, but you wouldn't take it until you went and seen what the company was.

Q. Did Mr. Moore ever make any representation of the value of the stock before the deal? A. He spoke about the stock being good—'As far as I know, the stock is good; I would not take less than $110 a share.'

Q. That is what Mr. Moore said? A. Yes.

Q. Did he tell you to investigate? A. Yes."

There was no testimony on the part of plaintiff showing, or tending to show, that Moore did not pay $110 for the stock, nor, indeed, what price he paid; nothing to show that if any of his alleged statements of fact were false, he knew them to be false, except as to the price he had paid; nothing tending to show that he knew or had opportunity to know, anything more about the company's affairs than Carrick and Estes knew. The witness Ball testified that he had seen Moore in the office of the company—Ball was there himself.

At the time of the trial in this case, Moore was called as a witness in his own behalf. He testified that he had owned and traded some of the stock; that the stock he traded to Ball he got from a Mr. Lundy, paying him therefore ten acres of land in Idaho and $750 cash; that the stock he traded to Mr. Carrick he got through a deal with a Mr. G. W. Crotz, of Vancouver, about the middle of February, 1911, in exchange for 120 shares of stock in the Crescent Lumber Company, which he obtained in exchange for 160 acres of land in Washington. The value of the parcels of land and personal property which he exchanged for stock was not given or asked. Moore testified that he was not interested in the insurance

company; had never purchased any stock directly from it, but only in the market; that at the time he dealt with Carrick, it was being traded in the market at $110, and that he believed it was all right, and his testimony was not disputed except as hereinbefore related.

The cause was tried to the court without the intervention of a jury, and the court rendered judgment for the plaintiff upon findings of fact in substance that the insurance company was a "cloak for a swindle;" that the stock was worth nothing; from which, and the further fact that Moore had had some dealings with the president, and had directed Estes to the president for information, it was conclusively presumed that he had done so with knowledge of the president's fraud, and of what answer he would give; therefore was chargeable with actual fraud in this proceeding.

In form, this is an action, equitable in its nature, to recover the purchase price, to-wit, land, paid by the plaintiff for certain shares of stock, after tendering back the stock, and rescinding the contract of purchase and sale, upon discovery of the alleged fraud. The only cause of action stated in the complaint is based upon the fraudulent representations of the defendant, made by him alone or in conspiracy with others. The fraud charged is not constructive or implied, but active, intentional fraud, involving moral turpitude.

There is some diversity of opinion as to whether the same rules which apply to actions to recover damages for deceit apply to cases equitable in their nature, such, for instance, as for rescission of contracts on the ground of misrepresentation; but in this state slight, if any, distinction is made, and we think no difference when the fraud charged is actual and intentional. *Sellar v. Clelland,* 2 Colo. 532; *Larimer County L. & I. Co. v. Cowan,* 5 Colo. 320; *Wheeler v. Dunn,* 13 Colo. 428, 22 Pac. 827; *Connell v. El Paso G. M. & M. Co.,* 33 Colo. 30, 78 Pac. 677; *Colorado Springs Co. v. Wight,* 44 Colo. 179, 96 Pac. 820.

As defined by the foregoing authorities, actionable fraud is a false representation of a material fact (as distinguished from an opinion), made with knowledge of its falsity, or recklessly without belief in its truth, with the intention that it should be acted upon by the complaining party, and relied on by and actually inducing him to act upon it to his damage. See also 9 *Cyc.* 411.

*Sellar v. Clelland* was an action to recover damages for deceit. *Larimer County L. & I. Co. v. Cowan* was an action in equity, praying for the cancellation of a deed made by the plaintiff. The court quoted and adopted the following rule as laid down in *Kerr on Fraud and Mistake*, 73:

"In order that a misrepresentation may support an action or be of any avail whatever as a ground of relief in equity, it is essential that it should be material in its nature, and should be a determining ground of the transaction. The misrepresentation must be, in the language of the Roman law, *dolus dans locum contractui.* There must be the assertion of a fact on which the person entering into the transaction relied, and in the absence of which it is reasonable to infer that he would not have entered into it at all, or at least not on the same terms. Both facts must concur; there must be false and material representations, and the party seeking relief should have acted on the faith and credit of such representations. * * * A misrepresentation goes for nothing unless it is a proximate and immediate cause of the transaction. It is not enough that it may have remotely or indirectly contributed to the transaction, or may have supplied a motive to the other party to enter into it. The representation must be the very ground on which the transaction has taken place."

The foregoing excerpt was also cited and quoted with approval in *Wheeler v. Dunn*, at page 436. In *Connell v. El Paso Company*, which was an action in equity for rescission of an executed contract of purchase and sale, for the cancellation of a deed and recovery of the purchase money, Mr. Justice Campbell, speaking for the court, said:

"It is a settled doctrine of this court, ever since the decision in *Sellar v. Clelland*, 2 Colo. 532, that for a misrepresentation to be actionable the party charging the same must, *inter alia*, show not only that it is false, but that the party making it knew it to be false. This general doctrine, however, is subject to the modification that 'when one has made a representation positively, or professing to speak as of his own knowledge on the subject, the intentional falsehood is disclosed, and the intention to deceive is also inferred, or at all events, this is so when the matters falsely represented are peculiarly within the knowledge of the party making them, and are not known to the party to whom they are made.' "

In *Colorado Springs Company v. Wight,* an action to recover damages for alleged misrepresentations, the same rule is approved, and the elements going to make up fraudulent representation, as enumerated by Pomeroy, are given, to-wit: "A misrepresentation, in order to constitute fraud, must contain the following essential elements: (1) Its form as a statement of fact; (2) Its purpose of inducing the other party to act; (3) Its untruth; (4) The knowledge or belief of the party making it; (5) The belief, trust, and reliance of the one to whom it is made; (6) Its materiality."

Under the foregoing rules, there is an utter failure of evidence to support the judgment. Moore's representation that the stock was good, is, under all the authorities, an expression of opinion only; as also under the evidence is his statement that the stock was worth $110, when coupled with the qualification "as far as I know," and as affected by the fact that he had no peculiar means of knowledge as to the condition of the company or the acts of its officers whose criminality or delinquency destroyed the market value, as well as the intrinsic value, of the stock. That statements as to value under such circumstances are generally regarded as opinions only, and may not be relied upon, is decided in *Noetling v. Wright,* 72 Ill. 390; *Page v. Parker,* 43 N. H. 363, 80 Am. Dec. 172; *Poland v. Brownell,* 131 Mass. 138, 41 Am.

Rep. 215; *Plummer v. Rigdon*, 78 Ill. 222, 228, 20 Am. Rep. 261; *Kennedy v. Richardson*, 70 Ind. 524, 534; *Hoffman v. Wilhelm*, 68 Iowa 510, 27 N. W. 483; *Bristol v. Braidwood*, 28 Mich. 191; *Columbia Electric Co. v. Dixon*, 46 Minn. 463, 49 N. W. 244; *Brownlow v. Wollard*, 61 Mo. App. 124; *Nostrum v. Halliday*, 39 Neb. 828, 58 N. W. 429; *Smith v. Mitchell*, 6 Ga. 458; *Little v. Allen*, 56 Tex. 133, 139; *Conlan v. Roemer*, 52 N. J. Law, 53, 18 Atl. 858. See, also, extended note to *Fargo Gaslight & Coke Co. v. Fargo Gas & Electric Co.*, 37 L. R. A. 593.

In *Connell v. El Paso G. M. & M. Co.*, 33 Colo. 30, 78 Pac. 677, it is held that a representation of the amount paid for property is a material fact, and if false and relied on will avoid the contract. But whether that statement or any of the statements alleged to have been made by Moore are regarded as mere opinions, or as statements of fact, it is manifest that they were not relied upon by the plaintiff in this case. There is a total absence of evidence that these statements were ever communicated to or came to the knowledge of the plaintiff. The record is utterly devoid of any evidence, direct or indirect, tending to show that the plaintiff relied on any such representations, or that Estes, in acting for him, relied on such statements. On the contrary, there is a direct and positive statement made by Estes that he did not act thereon, but rather upon his own independent investigation. That both the plaintiff and Estes did rely upon their own investigations is abundantly established by their own evidence, twice given and recorded. It is almost universally held, under circumstances as here shown, that if investigation is made by the buyer, he cannot claim that he relied on the representations of the seller, except in cases of active fraud or concealment, or in cases where fiduciary relations existed, or peculiar knowledge upon the part of the seller was shown. *Fauntleroy v. Wilcox*, 80 Ill. 477; *Fisher v. Dillon*, 62 Ill. 379; *Port v. Williams*, 6 Ind. 219; *Colton v. Stanford*, 82 Cal. 351, 23 Pac. 16, 161 Am. St. Rep. 137; *Grider v. Klopton*, 27 Ark. 244;

*Southern Development Co. v. Silva,* 125 U. S. 247, 8 Sup. Ct. 881, 31 L. Ed. 678; *Anderson v. McPike,* 86 Mo. 293; *Herron v. Herron,* 71 Iowa 428, 32 N. W. 407.

The claim that plaintiff relied upon Moore's statements that the stock was worth above par is negatived by the fact that immediately before he concluded this trade he purchased other of the same stock and contracted to sell the same at par. As to the statement made by Moore that he paid a certain price for his stock, there is no proof that such statement was false, even if there had been anything to show, or tending to show, that such statement had been relied on; and the fact, shown by plaintiff's evidence, that the stock was being purchased in considerable quantities by persons, having as good opportunities for investigation and knowledge as had Moore, and who were taking it at par, corroborates and establishes the truth of defendant's statement that the stock was good and had value, if, as is generally the case, by "value" is meant what it is bringing in the market.

All material evidence upon the part of plaintiff having been submitted by deposition, this court is not governed by the usual rule that findings of the trial court upon conflicting evidence is binding upon the court of review, and the evidence offered by the plaintiff is in no manner aided by the oral testimony of the defendant.

We think it is not amiss to call attention to the fact that plaintiff does not come into this court with unsoiled hands. Representations were made to defendant that the land offered in exchange for his stock was worth $500 an acre, while the evidence offered at the trial showed that as good land, better situated, more highly improved, was offered in the market at $250 or less an acre.

Because of the entire failure upon the part of the plaintiff to sustain the charge of fraud, and because of the conclusive showing that plaintiff did not rely upon the representations alleged to have been made by defendant, the judgment must be reversed and the cause remanded. However,

there remains the possibility that upon proper allegations a case might be stated admitting evidence of mutual mistake upon the part of both the plaintiff and the defendant, of which a court of equity might take cognizance.   No suggestion of such a case was made in the trial court or is made in this court.   It is evident from the complaint and the finding of the trial court that the cause of action and judgment were based upon allegation and finding of fraud in its most odious sense, and that being true, this court is not at liberty to make a finding or to direct proceedings or judgment under any other theory or cause of action; but the reversal will be without prejudice to the right of plaintiff to institute another action, if he be so advised, for rescission of the contract on the ground of mutual mistake.—*Connell v. El Paso G. M. & M. Co., supra; Colorado Springs Company v. Wight, supra.*

*Reversed and Remanded.*