No. 19,165.

GUARANTEE RESERVE LIFE INSURANCE COMPANY, ET AL. *v.*
JOHN G. HOLZWARTH, ET AL.

(366 P. [2d] 377)

Decided November 13, 1961.   Rehearing denied December 4, 1961.

Messrs. GRANT, SHAFROTH, TOLL, CHILSON, AND MC-HENDRIE, Mr. ERL H. ELLIS, for plaintiffs in error.

Messrs. DAWSON, NAGEL, SHERMAN AND HOWARD, Mr. JOHN W. LOW, Mr. ARTHUR K. UNDERWOOD, JR., for defendants in error.

*In Department.*

Opinion by MR. CHIEF JUSTICE HALL.

IN the trial court the plaintiffs in error were defendants and the defendants in error were plaintiffs. We refer to defendants in error as plaintiffs or individually as John or Caroline; to the plaintiffs in error Guarantee Reserve Life Insurance Company as Guarantee, The American Hospital and Life Insurance Company as American, and S. E. McCreless by name.

Long prior to 1953 plaintiffs owned stock in Guarantee and its predecessor. In 1949 John became a policyholder in Guarantee. Prior to 1953 Guarantee had held several annual conventions at the Grand Lake Dude Ranch of plaintiffs.

On February 17, 1954, Guarantee loaned plaintiffs

$46,000.00. The indebtedness arising out of this loan was evidenced by a promissory note payable in annual instalments of $3066.66 with interest at five and one-half per cent, and secured by deed of trust on three parcels of Grand County real property with an appraised value of $190,050.00.

In all of the dealings whereby John became a policy-holder and plaintiffs became stockholders in and borrowers from Guarantee, as well as host to those attending its annual conventions, he and they dealt entirely with one John S. Sherritt, principal stockholder and president of Guarantee, and one Charles M. Buescher, Jr., son-in-law of Sherritt and general counsel, stockholder and director of Guarantee.

As early as March 1953 and prior to making the loan to plaintiffs, Guarantee was in serious financial difficulties; in fact, the Insurance Commissioner of Colorado was insisting that its alleged surplus be made real instead of fanciful.

To meet this problem the directors of Guarantee met on March 2, 1953, and decided to offer on a pre-emptive basis to its then stockholders from authorized but unissued shares of its stock one share for each share held at $2.00 per share. The insurance commissioner took a dim view of this proposal for the reason that such sale would not produce sufficient funds to establish an adequate surplus and "thought" that to assure an adequate surplus the sales price should be raised to $3.50 per share. Consequently, another directors' meeting was held May 26, 1953, at which it was agreed that the stock be offered at $3.50 per share instead of $2.00.

Understandably, the stockholders were laggard in exercising the pre-emptive right to add to their then holdings; consequently, some of the stock offered remained unsold.

About August 1, 1954, Sherritt and Buescher called on plaintiffs at their ranch and offered to sell to them 10,000 shares of Guarantee stock at $3.50 per share. By

way of inducement they offered to reduce the interest on the $46,000.00 loan from five and one-half to four and one-half percent; to make John a director of Guarantee, and to increase their loan to $91,000.00 to take care of the $46,000.00 loan, $35,000.00 to pay for the stock, and an additional $10,000.00 for ranch improvements. Plaintiffs made no commitment but told Sherritt and Buescher that they would consider the matter and advise them later.

About two weeks thereafter John went to Guarantee's office in Fort Collins and there met Sherritt and discussed with him the foregoing proposal. John, speaking for himself and Caroline, accepted the proposal as outlined by Sherritt and Buescher at the ranch, subject to the following provisions: (1) that for three years they pay no interest on the $35,000.00 to be borrowed to purchase the stock, and for a like period they receive no dividends declared on the stock; (2) that of the three tracts of land described in the $46,000.00 mortgage, only one (the home place appraised at $150,000.00) be included, and that in lieu of the two parcels omitted they pledge the 10,000 shares of stock; (3) that he not be made a director; (4) that there be a repurchase agreement whereby plaintiffs could at any time within three years elect not to keep the 10,000 shares of stock, whereupon their indebtedness to Guarantee would be reduced by $35,000.00. Sherritt agreed to these conditions and stated that he would have Buescher draw up the necessary papers.

A week or two after this meeting between Sherritt and John, Buescher and his wife appeared at the home of plaintiffs and at that time and place the following transpired: (1) plaintiffs signed a note dated August 5, 1954, payable to Guarantee for $87,847.32; (2) they signed a new deed of trust containing only the one parcel of land, recorded September 16, 1954; (3) to further secure this note they received and endorsed in blank stock certificate No. 4025 of Guarantee for 10,000 shares

of its stock — this certificate was signed for Guarantee by Sherritt, president, and one Smith, secretary; (4) they received Guarantee's check for $35,000 which they endorsed in blank. The plaintiffs on that occasion delivered all of the foregoing documents to Buescher.

■ John and Buescher testified to all of the foregoing facts — there was no testimony to the contrary. At the time of delivery of these documents, according to the uncontradicted testimony, the contractual rights and duties of plaintiffs and Guarantee were fully consummated, defined and fixed and the trial court should have so held.

On or about August 27, 1954, plaintiffs received through the mail a letter dated at Fort Collins, Colorado, August 27, 1954, written on stationery of Guarantee. In the upper left corner appears: "John S. Sherritt, President." In the upper right corner appears: "Franklin Beard, Secretary." This letter is as follows:

"John G. Holzwarth and Caroline E. Holzwarth
 Grand Lake, Colorado
"Dear Mr. and Mrs. Holzwarth:

"Referring to your Mortgage dated August 15, 1954, please be advised that your payments under that Mortgage providing you do not draw the additional $10,000 provided for in the face amount of the Mortgage will be $3,432.37 payable on August 15, of each year from August 15, 1954, until paid in full. This payment will be in lieu of that payment set out in the said Deed of Trust and Note itself. Interest payments will continue as provided for in the said Note.

"In consideration of your assigning all dividend rights under Stock Certificate No. 4025 for 10,000 shares of Guarantee Reserve Life Insurance Company capital stock issued to yourselves, we agree to pay the interest due on $35,000 under the above mentioned Noted and Deed of Trust for a period of three years from August 15, 1954, to and including August 15, 1957. We also agree that anytime upon sixty days notice in writing to repur-

chase the 10,000 shares of stock covered by the above mentioned Certificate for a full purchase price of $35,000.

"With kindest personal regards, we are

Sincerely yours,

*John S. Sherritt*

CMB/rr                          John S. Sherritt

*Charles M. Buescher, Jr.*

Charles M, Buescher, Jr."

John testified that he looked at the letter, put it in his dresser drawer, and later put it in his bank box, but paid no particular attention to it, thinking it was evidence of his agreement with Guarantee.

In August of 1955 Sherritt visited plaintiffs at Grand Lake and advised them that he was selling the company (Guarantee to McCreless by exchange of stock) and they could trade their stock and get in on the same deal and go with him to Arizona. This plaintiffs declined to do and shortly thereafter decided to exercise their rights to return the stock and take credit for $35,000.00 on their mortgage. To that end John contacted Sherritt in person, who put off the repurchase until after the first of the year because: "the company has commitments now."

Early in January 1956, John got the letter of August 27, 1954, from his bank box and for the first time read it and observed that he had to give sixty days' notice in writing, so on January 5, 1956, he wrote to:

"Mr. Mac. Buescher

Guarantee Reserve Life Insurance Co.

Fort Collins, Colo."

advising him of his election of: "selling back to the company the 10,000 shares * * *."

This letter was never answered; he again wrote on March 5, 1956, and received no answer; again he wrote on March 26, 1956, and received no answer. These letters were all addressed as above.

On April 15, 1956, John directed a letter to: "John Sherritt, 1435 College, Fort Collins, Colo." He received no answer.

John then employed counsel who sought, without avail, to get performance on the agreement to repurchase. However, through counsel's efforts, Sherritt and Buescher, on August 17, 1956, executed and delivered their promissory note for $35,000.00 payable on or before April 1, 1957, to plaintiffs, which note was secured by 10,000 shares of Guarantee stock put up by Sherritt. There is nothing in the record to indicate that this in any manner released Guarantee.

On August 23, 1955, American and Guarantee entered into an agreement whereby American would, on proof, by certain designated methods of Guarantee's insolvency, take over all of the assets of Guarantee and assume all of its policy and other liabilities, except capital stock, surplus and reserves. The designated proof of Guarantee's insolvency was presented "prior to September 30, 1957," and on December 30, 1957, Guarantee transferred to American all of its assets pursuant to the agreement of August 23, 1955.

On July 25, 1957, plaintiffs filed their complaint setting up four separate causes of action against Guarantee, Sherritt and Buescher. On October 8, 1957, they filed an amended complaint setting up five separate causes of action and added McCreless as a party. On February 4, 1958, they filed a second amended and supplemental complaint setting up five separate causes of action and added American as a party thereto. On December 13, 1958, they filed their third amended and supplemental complaint, setting forth four separate causes of action, seeking judgment for $35,000.00. The four complaints containing eighteen causes of action and many inconsistencies and contradictions, represent a shotgun approach; however, one thing is clear — Holzwarths want $35,000.00 from someone on some theory.

On January 27, 1959, Guarantee, American and McCreless filed their answer and motion to dismiss.

Upon trial to a jury a verdict was returned in favor of plaintiffs for $35,000.00 against Guarantee, American

and McCreless. The verdict against Guarantee and American is based on the agreement to repurchase the stock. The verdict against McCreless is predicated on his acts as president and director of Guarantee in assenting to the declaration and payment of a dividend by Guarantee when Guarantee was insolvent. The jury also returned a verdict for $20,000 against Guarantee and American based on fraud in the sale of the stock to plaintiffs.

On May 26, 1959, judgment for $35,000.00, interest and costs was entered in favor of plaintiffs and against Guarantee, American and McCreless. No judgment was entered on the $20,000.00 verdict.

Guarantee, American and McCreless are here by writ of error seeking reversal.

There is little, if any, conflict in the testimony produced at the trial. Sherritt did not appear as a witness. Only John and Buescher testified as to any of the conversations which culminated in the new loan, stock purchase, agreement to repurchase and efforts of John to have the stock repurchased.

Both John and Buescher testified that all of the transactions were with Guarantee rather than with Sherritt individually. Understandably, testimony to establish liability of Guarantee would be helpful in plaintiffs' efforts to recover, and equally helpful to relieve Buescher of individual responsibility. However, there are many facts proved beyond question which tend to corroborate their testimony. There is no question that John had many dealings with Guarantee — he became a stockholder, a policyholder, a borrower and on numerous occasions served as host at its conventions. All of his dealings leading up to this controversy were with Sherritt, as president and principal stockholder of Guarantee. There is nothing in the record to indicate any dealings between John and Sherritt, as an individual.

John's testimony is all to the effect that in negotiating for the purchase of the stock with the various ramifica-

tions thereof, he was dealing with Guarantee and not Sherritt. Buescher corroborates this fully — there is no testimony to the contrary.

Counsel for plaintiffs in error point out that John received 10,000 shares of stock belonging to Sherritt and none from Guarantee. There is nothing in the record to indicate that John at the time the stock was delivered to him by Buescher, a director and general counsel of Guarantee, knew or could have known the source of the stock he received.

They also contend that the letter of August 27, 1954, claimed to be a repurchase agreement, is clearly the agreement of Sherritt and Buescher and not that of Guarantee. We do not agree.

True, it is signed by Sherritt and Buescher as individuals and without any format indicating that they signed in a representative capacity. However, the agreement is on a Guarantee letterhead showing Sherritt as president and, what is more important, dealing largely with the affairs of Guarantee.

In the first paragraph it speaks of (1) the August 15, 1954, mortgage (the mortgage of Guarantee); (2) the additional $10,000 to be available to John (from Guarantee); (3) the amount of the annual payments on the mortgage (to Guarantee); (4) an annual principal payment for a lesser amount than that provided in the note (payable to Guarantee provided the additional $10,000.00 is not drawn); (5) interest payments to be as provided in said note (payable to Guarantee). All of these matters affect plaintiffs and Guarantee — none pertains in any way to Sherritt or Buescher.

In the second paragraph of this letter it is unclear whether they are speaking for themselves or for the corporation. Buescher testified that it was for the corporation — John testified all his dealings were with the corporation.

Prior to the execution of this document John called at the office of Guarantee to give his decision on the

proposal of Guarantee that he purchase 10,000 shares of Guarantee stock. There he met Sherritt, president of the company, and according to his undisputed testimony they then and there agreed on everything — purchase of the stock, increasing his loan to cover the cost of the stock and $10,000.00 additional working capital; elimination of two tracts of land from his mortgage; reduction of his interest from five and one-half to four and one-half per cent; nonpayment of interest on $35,000.00; non-receipt of dividends from stock for three years, and Guarantee's agreement to repurchase the stock at any time within three years.

A few days later the transaction was consummated as agreed upon and, according to the uncontradicted testimony of John and Buescher, as a company deal. Repurchase of the stock was to take place, if at all, in the future. The agreement to repurchase the stock was of prime importance; it was an integral part of the whole transaction; without it nothing would have been done. To say that this one feature of the whole deal was the obligation of an individual or individuals and that all of the other benefits and obligations were those of Guarantee is not consonant with what John understood or which, under the circumstances, he was entitled to understand.

The fact that sometime after the transaction was completely consummated at the Grand Lake home of John there was mailed to John the letter in question, largely confirming what had transpired between John and Guarantee at Fort Collins, does not change or alter the agreement made with Sherritt at Fort Collins. True, it may serve to cast some doubt on the testimony of John and Buescher as to who was to repurchase; however, the jury resolved that question by adopting the version given by John and Buescher.

Much is made of the fact that the shares which were issued to John were transferred from Sherritts' holdings and not from treasury stock. This fact was un-

known to plaintiffs, who had no means of determining the source of the stock, and which under the facts shown was wholly immaterial. John and Buescher both testified that the company, not Sherritt, agreed to sell the stock. It is unimportant where the stock came from — once the agreed number of shares was transferred to plaintiffs, the company had met its commitment. The company could make a lawful agreement to sell stock which it did not then own, or it could retain its then holdings and fill the order from shares owned by others. *Kunzmann v. Petteys*, 74 Colo. 342, 221 Pac. 888; *Morrison v. Goodspeed*, 100 Colo. 470, 68 P. (2d) 458.

■ The main argument of plaintiffs in error is based on the contention that Guarantee did not agree to repurchase the stock. All of the testimony is to the contrary. Counsel contend that the document signed by Sherritt and Buescher shows clearly that they and not Guarantee agreed to repurchase. This contention ignores the fact that the entire transaction, including the agreement of Guarantee to repurchase, was completed prior to execution and delivery of the letter signed by Sherritt and Buescher. These two gentlemen could not ex parte, modify, add to or take from the agreement previously made in Fort Collins and consummated at Grand Lake by execution and delivery of all documents necessary to complete the transaction.

■ Counsel assign as error the admission in evidence of the letter of August 27, 1954, signed by Sherritt and Buescher, contending that it shows that the individuals and not Guarantee had agreed to repurchase. The agreement to repurchase the stock had been made prior to the time this document came into existence — thus the document could only serve the purpose of casting doubt on the testimony of John and Buescher. Admission of this document in evidence might well serve to create a conflict with plaintiffs' position and testimony, but can hardly be said to be prejudicial to Guarantee's contention that it had not agreed to repurchase.

Counsel also contend that even though judgment against Guarantee and American is proper, there is no basis for a judgment against McCreless.

Plaintiffs contend that McCreless is answerable under C.R.S. '53, 31-2-12:

"If the directors, trustees or other officers or agents of any corporation shall declare and pay any dividend when such corporation is insolvent, or any dividend the payment of which would render it insolvent, or would diminish the amount of its capital stock, all directors, trustees, agents or officers assenting thereto shall be jointly and severally liable for all debts of such corporation then existing, and for all that shall thereafter be contracted while the capital remains so diminished."

It is not disputed that McCreless was an officer and director of Guarantee in 1956, when Guarantee, though then insolvent, declared and paid a dividend and thus became liable for the debts of Guarantee unless relieved from liability because of C.R.S. '53, 72-2-3:

"The amount of dividend payments by any domestic insurance company shall be wholly within the discretion of its directors or of the duly constituted executive committee thereof. No dividend shall be paid except from the company's surplus.

"It shall be unlawful for the directors, trustees, managers, or officers of any domestic insurance company, directly or indirectly, to make or pay any dividends or pay any interest, bonus, or other allowance in lieu of dividends, other than premium refunds and deductions guaranteed, except from the company's surplus and from profits arising from the company's business. Any person who shall be found guilty of violating any provision of this section shall be punished by a fine of not more than one thousand dollars."

We find nothing inconsistent in these two statutes. The first imposes civil liability on officers, trustees, etc., of "any corporation" on payment of a dividend while insolvent. The second statute does not purport to

afford any relief from the burdens imposed by the first, but declares similar acts of officers, trustees, etc., of insurance companies to be "unlawful" and fixes the punishment of one "found guilty." One statute is civil, the other criminal, and the fact that McCreless might be tried and punished for unlawful acts does not preclude his being answerable in a civil action for the same acts though not designated as unlawful.

Counsel for defendants urge grounds for reversal in addition to those we have discussed, including the giving of instructions and refusal to give others tendered. All of which are predicated on the theory that the letter of August 27, 1954, constitutes the agreement to repurchase, whereas we have held that the agreement to repurchase, assented to by all parties, was made prior to the writing of the letter; which amounted to nothing more than defendants' version of the original agreement, that the letter is not properly a part of plaintiffs' case, though offered by them and admitted over defendants' objection.

This would appear to be a complete answer to the grounds urged for reversal.

Having carefully reviewed the record and finding no prejudicial error, the judgment is affirmed.

MR. JUSTICE FRANTZ and MR. JUSTICE McWILLIAMS concur.