## No. 13,891.

MORRISON, ADMINISTRATRIX *v.* GOODSPEED ET AL.
(68 P. [2d] 458)

Decided May 10, 1937.  Rehearing denied June 1, 1937.

Mr. ERNEST MORRIS, Mr. C. E. WAMPLER, for plaintiff in error.

Messrs. VAN CISE & ROBINSON, Mr. ROBERT D. CHARLTON, Mr. J. E. ROBINSON of counsel, for defendants in error.

*En Banc.*

MR. JUSTICE YOUNG delivered the opinion of the court.

THE parties appear here as in the district court and will be designated as plaintiff and defendants. Plaintiff as administratrix of the estate of her deceased husband, Clayton R. Morrison, sued the defendants, who were officers and directors of M. E. Traylor and Company, Inc., an investment company, for damages for alleged fraud and deceit in the sale of certain corporate stock to her husband in his lifetime. From a judgment rendered on a jury verdict adverse to her she prosecutes error.

The undisputed facts in the case are substantially as follows: M. E. Traylor and Company were engaged in a brokerage and investment business in the City and

County of Denver. During the year 1935 defendant Goodspeed was a director and president of the company; defendant Olin was a director; defendant Auhl was a director and secretary; and Clarence A. Walter was vice-president. The four officers, being also directors as stated, owned over 90 per cent of the stock of the company; all officed in the same room; the four had full charge and control of the company's business during all of the year 1934; and were in close touch with each other during all of the business hours of each day. All matters of importance were referred to Goodspeed, the president of the company. It was the duty of Goodspeed, according to his testimony, to supervise the business of the company, and that likewise was the duty of the other corporate officials.

The defendants admit in their answer, "That the aggregate of its property at a fair valuation was not sufficient in amount to pay its debts, but in that regard allege that in the month of May, 1934, and at all times thereafter until on or about the 9th day of November, 1934, the said company was able to pay its debts as they became due in the usual course of its business." The undisputed testimony of Goodspeed shows that in May, 1934, and until November 9, of that year, when the company became a voluntary bankrupt, it was insolvent. He was asked the direct question, whether it was insolvent during the year 1934, and answered: "It was." His further testimony will justify no reasonable conclusion other than that the liabilities of the company at the time of the transaction of which complaint is made herein were at least $130,000 greater than its assets. Defendants state in their answer, "That they knew of the financial condition of said M. E. Traylor & Company as above set forth and admit that the said Clayton R. Morrison did not know of such financial condition."

Defendants' Exhibit No. 3, signed by Morrison, is as follows:

"M. E. Traylor & Company,
Denver, Colorado.
5/7        1934
Salesman        WEO
"I offer to buy from you, as principals

| Stock and/or Bonds | Price |
|---|---|
| 400 United Aircraft Com | $19+12½c |
| 200 United Aircraft Com | $19+12½c |
| | Per Share |

"Subject to Acceptance by
M. E. Traylor & Company
C. R. Morrison,
Customer's Signature."

On May 12, 1934, defendants' Exhibit No. 1 was sent through the mail to Morrison:

"M. E. Traylor & Company,
Denver, Colorado, Investment Securities
No. 1821        1A
May 12, Val May 15, 1934

"As principals we hereby sell to you today, pursuant to your order given to our Mr. Olin

| Quantity | Description | Price | Tax | Total Amount |
|---|---|---|---|---|
| 400 | United Aircraft & Transport | 19 | | 7600 00 |
| | Plus | | | 50 00 |
| | | | | 7650 00 |

"Your acceptance of this statement shall constitute an acknowledgment by you that your purchase of these securities has been without representation by us of any fact or facts whatever bearing on the merits of such securities or serving as an inducement to your purchase thereof.

"Clayton R. Morrison
C/o Clayton Coal Co
Denham Building
Denver Colorado"

On the same date, or two days later, an exactly similar notice was sent to Morrison relating to 200 shares of the

same stock, which appears in the record as defendants' Exhibit No. 2.

On May 15, 1934, Morrison appeared at the office of the company and delivered to it his check for $10,000 and on the same day signed a card pledging the stock the company had sold him for the payment of the balance of the purchase price, approximately $1,600. This pledge agreement was introduced as defendants' Exhibit 4 and so far as here material is as follows:

"Morrison, C. R.

"Messrs. M. E. Traylor & Co., Inc:

"Denver Colorado, 5/15, 1934.

"I agree that all my transactions with you shall be governed by the following rules:

"As to securities purchased on partial payment plan: I will make such initial payment as may be agreed upon at the time of each purchase, and will pay you the balance of the purchase price in installments of not less than .... per cent of such purchase price each ............ thereafter. If at any time the market value of the securities held by you for my account shall be less than 140% of the balance then due on my account, I will, upon notice and demand, forthwith make such additional payments as will make the market value of such securities not less than 140% of such balance, or at your option furnish such additional collateral as you may deem satisfactory. Notice to me may be given by telephone, letter, or in any manner you may deem sufficient. In case of my failure to furnish such additional funds or securities within forty-eight hours after giving of such notice I authorize you to sell any or all of my securities at public or private sale without further notice to me. In case the market value of the securities in my account shall fall below 130% of the balance due on my account, I authorize you to sell any or all of such securities at public or private sale without demand on me for additional funds or securities, and without any notice to me whatever. In case any sale shall net less than the balance owed you by me, I

agree to pay the deficiency on demand. Provided, however, that if default be made in the payment of any installment of the purchase price of any security, and such default shall continue for ten days, then such security shall be deemed to be held thereafter on margin, and subject to the rules hereinafter set forth governing margin transactions.

\*    \*    \*    \*

"As to all securities: Any interest or dividends upon any securities purchased by me shall be received by you and credited to my account until I shall have fully paid for such securities, and you are authorized to clip coupons from any bonds and to endorse any dividend checks which you may receive upon such securities for that purpose. You shall not be required to set aside and hold for me any specific shares of stock or bonds which I may purchase unless you so desire, but it shall be sufficient if you are prepared to deliver to me such stocks or bonds when I shall have fully paid the purchase price. You shall have a lien upon all stocks and bonds purchased by me for any amount owing to you by me, and shall have the right to pledge or hypothecate any securities held for my account, either separately or together with securities of others or of your own, and either for the amount I may be owing or for any greater or less amount I agree to pay interest on the monthly balances owed you by me at the rate then commonly paid in Denver upon like transactions. I agree that all securities and funds, now or hereafter in your possession, in which at any time I have any interest, may be held by you as security for the discharge of any obligation of mine to you, and/or for the payment of any demand which you may have against me, whether due or not. I agree further that you may become the purchaser of my securities, or any of them, at any sale held under the terms hereof.

Name......C. R. Morrison

Address    616 Denham"

On the day that the company sold Morrison the stock,

received his check and caused the pledge card to be signed, it had an overdraft at the bank of $3,525.78. On May 15th, in addition to Morrison's $10,000, the company received $2,940.28, which, with Morrison's check was deposited in the bank. On that same day Goodspeed was paid on account of salary $260, Olin $300, Walter $200 and Auhl $240. Plaintiff's Exhibits B and C are statements of Morrison's account with the company for the months of July and September, 1934, each bearing the initials of defendant Olin, charging interest against Morrison on his unpaid balance. Exhibit C indicated that they had delivered six hundred shares of United Aircraft in exchange for stock in reorganized companies; that they had received such stock in exchange, and that the company was "long" to the number of shares received in the exchange. The testimony of Goodspeed was that such stock never was received and that the so-called exchange was purely a paper transaction in the office of Traylor and Company.

The foregoing statement of the evidence does not include any part of alleged telephone conversations between Morrison and Olin overheard, as to Morrison's part, by witnesses for the defense, Spangler and Glenn, which tend to make a stronger case for plaintiff if the jury should believe these witnesses. It is the contention of defendants that in these transactions with Morrison, Traylor and Company acted as principal and not as a broker or agent to purchase stock for him. It is significant, though we do not predicate our holding on that fact, that the company charged him the regular broker's commission, for selling to him as a principal, if it did so. Whether in dealing with Morrison, Traylor and Company was acting as principal, or for him as agent, the company, a corporation, was acting through defendants, or some one or more of them, as *its* agents, for it is elementary that a corporation can act in no other way than by agents. It is not the manner in which the corporation acted that is here in question, but the integrity of its agents in causing it to so act, that is challenged in this action.

As a matter of undisputed fact the company never bought 600 shares of United Aircraft stock for Morrison and did not own 600 shares or any other amount of it when it sold him 600 shares and took his $10,000. Subsequent to such sale to him and up to the date it was adjudicated a bankrupt, it never procured or owned a share of such stock that it could have delivered to him had he paid the balance of the purchase price.

The net result, therefore, of this transaction was that Morrison gave the company his order for 600 shares of the stock at nineteen dollars per share; that acting through some one or more of the defendants as its agent it purported to sell to him and took $10,000 of his money in payment for such stock. In effect the company gave him a fluctuating I. O. U. of a company known to defendants to be insolvent—of which insolvency Morrison was ignorant—the obligation under which rose or fell as the price of United Aircraft rose above or fell below the purchase price. This was the only assurance Morrison had that he ever would get the stock.

The foregoing facts are admitted in the pleadings, testified to by one of the defendants, or appear from uncontradicted evidence. In reality the facts stated constitute the defendants' defense to the charge of fraud. We are of the opinion that these facts constitute fraud.

The constituents of fraud, though manifesting themselves in a multitude of forms, are so well recognized that they may be said to be elementary. They consist of the following: (1) A false representation of a material existing fact, or a representation as to a material existing fact made with a reckless disregard of its truth or falsity; or a concealment of a material existing fact, that in equity and good conscience should be disclosed. (2) Knowledge on the part of the one making the representation that it is false; or utter indifference to its truth or falsity; or knowledge that he is concealing a material fact that in equity and good conscience he should disclose. (3) Ignorance on the part of the one to whom representations are

made or from whom such fact is concealed, or the falsity of the representation or of the existence of the fact concealed. (4) The representation or concealment made or practiced with the intention that it shall be acted upon. (5) Action on the representation or concealment resulting in damage. *Wheeler v. Dunn,* 13 Colo. 428, 22 Pac. 827.

Let us examine the uncontroverted facts as related to these elements of fraud.

If, as defendants contend, Morrison dealt with the company as a principal selling its own stock, and not as a broker buying it from another for him, he had a right to assume that the seller could and would give him title to that which he was purchasing. Generally, we may concede the correctness of the law as stated by defendants that "It is enough to say  *  *  *  that the common law never forbids any contract to sell merely because the seller does not own the goods which are the subject of the bargain." Williston on Sales, section 128; and as stated in *Kunzmann v. Petteys,* 74 Colo. 342, 221 Pac. 888, that "Public policy does not prevent one from making a valid agreement to sell or dispose of property which he does not own at the time." But equity often inquires into the circumstances under which contracts ordinarily valid were entered into, and if these show fraud practiced in procuring one to enter into the contract, it does not hesitate to set it aside or to award damages for the wrong. Concededly Traylor & Company did not own the subject matter of the sale in this case. Admittedly Morrison was not advised of this fact and did not know of it. It was peculiarly within the knowledge of defendants. The only public record available—the report for the year 1933 made to the secretary of state—on its face showed the company to be solvent. A part of the very $10,000 that Morrison gave for the purchased stock was used on the day he paid it to pay an overdraft of the company at the bank and salaries of the defendants. By such use the general obligations of the company were diminished, but its assets were not augmented. Morrison, under his

pledge of the stock to secure the unpaid portion of the purchase price, was entitled to pay such portion and receive his stock; but the company *then* was insolvent and known by defendants to be so. If the so-called short sale created but an unsecured obligation of the company to deliver title when the small remaining purchase price was paid, and the company had no present ability to purchase stock to comply with its contract other than out of the money paid it by Morrison, was not this a fact so evidently material that it admits of no conclusion other than that Morrison, who defendants point out was a business man and accustomed to making contracts, would have considered it before parting with the $10,000 that he had just borrowed at the bank, pledging stock in his own company for its payment? Can it be inferred that a knowledge of such fact would not have influenced his action? We think not. Of materiality it is said in Kerr on Fraud and Mistake (4th ed.), pages 43-44: "If the statement would tend to induce him to enter into the contract, or would be part of the inducement, the inference is that he acted on the inducement, unless he knew the facts or avowedly did not rely on the statement. A man who has made a false representation in respect of material matter must, in order to be able to rely on the defence that the transaction was not entered into on the faith of the representation, be able to prove to demonstration that it was [not] relied on   *   *   *"

"The test, therefore, of material inducement is not whether the plaintiff's action *would,* but whether it *might,* have been different if the misrepresentation had not been made."

In Bigelow on Fraud, page 497, it is stated: "In the next place the representation must have been material; that is, it must not only have induced the action taken, it must have been adequate to induce it by offering a motive sufficient to influence the conduct of a man of average intelligence and prudence." See, also, *Sellar v. Clelland,* 2 Colo. 532.

Defendants contend that materiality is a question for the jury, not for the court, and quote the following from *Connecticut Co. v. Colorado Co.*, 50 Colo. 424, 116 Pac. 154: "It was not for the court to say, as a matter of law, that the facts alleged to have been concealed, were material, and that the insured had intentionally and fraudulently withheld them." This particular case involved the failure to disclose certain alleged material facts in procuring a policy of insurance on a reduction mill. The court pointed out that "the materiality of these facts was not fixed by any writing, as is often the case in insurance, but it must be drawn from circumstances." It stated also: "It is said in May on Insurance, vol. 1, sec. 195, that where the materiality is to be inferred from circumstances and not upon the construction of some writing, it is a question for the jury." There, no question had been asked concerning the facts allegedly concealed. The holding of the court was that no error was committed in refusing to instruct the jury to return a verdict for the defendant (insurance company) so far as such concealments were concerned. We think this case is not authority contrary to the proposition that when reasonable men could draw but one inference from the facts, materiality is a question of law for the court.

Traylor and Company offered to sell Morrison 600 shares of a particular stock. It, acting through defendants, in fact sold him for $10,000, the general obligation of an insolvent company to deliver that stock to him in the future, and did not disclose to him that he was not getting that which they offered to sell him, and that he did not have what they required him to pledge to them as security for an unpaid balance. Later they advised him as a fact that they had exchanged 600 shares of Aircraft stock for shares in three companies formed as a reorganization of the aircraft company and that they had received this stock in the reorganized companies. In reality this was a mere hypothetical exchange of the stock Morrison supposed he had for stock he was supposed to

get in reorganized companies. It was a mere paper transaction in the office of Traylor and Company, but the notices sent out were well calculated to cause him to believe that the company had received and held stock for him in the reorganized companies. While the company might lawfully contract to sell to him what it did not have, it does not follow that a contract so to do was not fraudulent if defendants concealed from him the present facts indicating their almost certain inability to fulfill the contract.

Defendants call attention to the language of exhibit 4, the pledge contract, which Morrison signed, that: "You shall not be required to set aside and hold for me any specific shares of stock or bonds which I may purchase unless you so desire, but it shall be sufficient if you are prepared to deliver to me such stocks or bonds when I shall have fully paid the purchase price. You shall have a lien upon all stocks and bonds purchased by me for any amount owing to you by me, and shall have the right to pledge or hypothecate any securities held for my account, either separately or together with securities of others or of your own, and either for the amount I may be owing or for any greater or less amount." This can avail them nothing because Morrison, when he signed the contract, was acting in ignorance of the same facts of which he was ignorant when he parted with his money. The fact of the insolvency of the company was equally material as a factor to be considered by him in determining whether he would permit such dealing with securities purchased by the company, as it was in the first instance in determining whether he would part with his money and receive in return only the general obligation of an insolvent company.

The defendants point to the fact that following this short sale they delivered to their customers practically three quarters of a million dollars worth of stocks. For aught the record discloses these stocks were purchased with moneys which purchasers paid. The presi-

dent of defendant company admits that as the date of bankruptcy approached it became increasingly difficult for them to deliver stock paid for, that they could not make some deliveries, and that this condition had existed for quite a number of months prior to that time. The fraud of which complaint is made, consummated when Morrison paid his money, is neither palliated nor aggravated by honest or dishonest deals with others. No more can failure to reveal such facts be excused by defendants' faith that they could save their admittedly insolvent company because of better business prospects incident to the "New Deal" or to any other hoped for favorable conditions. Equity does not permit one man to gamble *secretly* with another man's money, no matter how honest his motives or sanguine his expectation of success.

We think the evidence admits of no reasonable conclusion other than that there was a concealment of material facts from Morrison that equity and good conscience required be disclosed. That he was ignorant of the facts concealed is admitted. That defendants made the offer and closed the deal under such circumstances admits of no other inference than that they intended Morrison to act without a knowledge of the concealed facts. He did so act without such knowledge to his damage. This constitutes fraud.

The record admits of no doubt that Olin, who personally handled the Morrison transaction, perpetrated a fraud. Plaintiff charges a conspiracy between all four of the defendants to defraud Morrison. In a civil action conspiracy is not actionable per se. The proof of conspiracy in such actions is admitted in order that what otherwise might appear to be unrelated acts of several individuals shall appear as related parts of a single transaction, in which the acts of each are in fact the acts of the others in furtherance of a common design, the consummation of which results in damage. The gist of such an action is damages and no right of action accrues until damages are sustained. The proof of a conspiracy in

civil cases also determines who shall respond in damages. Action of an individual which would cause him to be liable for damages, if acquiesced in by two or more others, and in which they co-operated, imposes on all who participated the obligation to respond in damages resulting from the consummation of the common design. In *Pullen v. Headberg*, 53 Colo. 502, 127 Pac. 954, we said: "At common law a conspiracy is defined as a combination between two or more persons to do a criminal or unlawful act or a lawful act by criminal or unlawful means. In criminal prosecutions, the gist of the action is the conspiracy. But in civil cases, the gist of the action is not the conspiracy, but the damages resulting from it, and unless a civil action in damages would lie against one of the conspirators, if the act was done by him alone, it will not lie against many acting in concert. The object of the criminal action is punishment against the wrongdoers. The object of the civil action is to recover any damages resulting from carrying out the conspiracy."

Plaintiff tendered, among others, the following instruction which was refused by the court: "The jury are instructed that, in proof of the charge of conspiracy, it is sufficient if it be shown by the evidence that the defendants were actually pursuing in concert a common design or purpose to cheat and defraud the public generally, that is to say, such persons as might deal with M. E. Traylor & Company by inducing in the minds of such persons the belief that such company was the owner of the stocks it sold such persons, when in truth it was not, with the intention on the part of the defendants that such persons should actually believe that such ownership existed and that such persons should, acting under such belief, give said company money or property in payment or part payment of the purchase price of such stocks. Proof of the alleged conspiracy does not require that there shall have been a common plan or design on the part of the defendants to cheat or defraud Clayton R. Morrison in particular, or that the defendants shall have

agreed upon the details of the plan, if any, to so cheat and defraud, or that the other defendants shall have consented to or authorized the particular means employed by one of them to accomplish the general purpose, if any, of the defendants.''

Since conspiracy is not civilly actionable per se, but becomes material only if damages result from carrying it out, it need not be shown to have been entered into for the specific purpose of defrauding the particular person damaged. On the same principle that representations made with a reckless disregard of their truth or falsity, if shown to be false, though not actually known to be such by the person making them, may serve as a basis for fraud, the proof of a common design to deal generally in such a manner with whoever presents himself that a fraud will be perpetrated on him, is proof of a fact that entitles any person—in this case Morrison, to proceed in damages against all who are parties to such scheme. If such agreement and concert of action resulted in damages to Morrison, it is such result that constitutes his cause of action, and it is good as against all who participated in producing it. It was error to refuse the instruction.

Plaintiff's tendered instruction 3, likewise refused, concerning inferences to be drawn from the evidence, was a correct statement of the law as applied to the facts in the case. It was error to refuse it.

■ The court by giving an instruction fixing the measure of damages at $10,000 indicated its recognition of the fact that it was error to admit testimony that the stock in question was worth at the time of the bankruptcy $7,337.50 and that on that date the net indebtedness of Traylor and Company was $5,870.97. Since the cause must be retried this error should not be repeated.

Instruction No. 5 given by the court, concerning false representations, is objected to by plaintiff and error assigned thereon because it unduly emphasizes the matter of materiality. We think this objection not well founded; however, in view of the fact that the cause is to be

retried we think it pertinent to observe, though that question is not raised by the objection, that the instruction is a doubtful statement of the law and might be improved both as to form and substance in the light of the authorities on materiality mentioned in the briefs, some of which are cited in this opinion.

Plaintiff also objected to the court's instruction No. 7 and assigned error thereon because it singles out insolvency as one item of the evidence and particularly directs the jury's attention to that item. As an abstract proposition of law the instruction is correct. If the court felt that there was danger, under all the facts of the case, of the jury basing a verdict on that one fact it was a proper exercise of discretion to instruct concerning it, but it would have been better to follow it with the qualification that insolvency is a fact that may be considered with all other facts in the case in determining whether what was done by defendants constituted fraud.

Instruction No. 3 given by the court is objected to on the ground that it submitted some issues to the jury that either were admitted or concerning which the evidence was not conflicting. We think as applied to the case before us it has that vice. In the light of our previous observations concerning the evidence as here presented we need not point out more specifically wherein the error lies, particularly in view of the fact that there may be additional evidence on a retrial.

For the reasons herein announced the judgment is reversed and the cause remanded to the district court for further proceedings not inconsistent with the views herein expressed.

MR. JUSTICE BOUCK dissents.

The following dissenting opinion was filed July 19, 1937.

MR. JUSTICE BOUCK, dissenting.

When the majority opinion was announced, my dissent therefrom was noted without giving my reasons, the

available time not then permitting the writing of a dissenting opinion. In justice to the litigants, but more especially to the trial court which is to retry the case, I now restate in substance the arguments I made to my colleagues in conference.

1. The majority opinion lists what it calls the elementary constituents of fraud as follows: "(1) A false representation of a material existing fact, or a representation as to a material existing fact made with a reckless disregard of its truth or falsity; *or a concealment of a material existing fact, that in equity and good conscience should be disclosed.* (2) Knowledge on the part of the one making the representation that it is false; *or knowledge that he is concealing a material fact that in equity and good conscience he should disclose.* (3) Ignorance on the part of the one to whom representations are made *or from whom such fact is concealed,* of the falsity of the representation or *of the existence of the fact concealed.* (4) The representation *or concealment* made or practiced with the intention that it shall be acted upon. (5) Action on the representation *or concealment* resulting in damage." (Italics are mine.) The opinion is obviously built up on the italicized portion of the statement, which deal with concealment. In support of the statement there is cited only one case, *Wheeler v. Dunn,* 13 Colo. 428, 22 Pac. 827. However, the Wheeler case is not authority therefor. It does not deal at all with concealment as the equivalent of a false representation. In fact, that case—which, incidentaly, was a suit in equity for rescission and not an action of deceit—expressly adopts the well-recognized analysis of false representation as found in Bigelow on Frauds: "(1) A false representation. (2) Knowledge by the person who made it of its falsity. (3) Ignorance of its falsity by the person to whom it was made. (4) Intention that it should be acted upon. (5) Acting upon it, with damage." The Wheeler opinion then proceeds: "An action at law for damage for deceit requires all these elements." It then

mentions that the requirements are less rigorous in equity. There is no doubt that in certain kinds of cases in equity—of which kinds the Wheeler case itself was not an instance—a concealment of facts would justify rescission. The case at bar, however, is purely an action at law. It is the ordinary tort action of deceit, that is, to recover damages for an alleged fraudulent representation. Indeed, the complaint here demands exemplary damages and a body execution, two remedies which are accorded by Colorado statute to actions at law only and among those to tort actions alone. '35 C. S. A., vol. 2, page 1192, ch. 50, sec. 6; id., vol. 3, page 1085, ch. 73, sec. 74. The plain truth is that an unequivocal election of remedies was effected by bringing this action of deceit, and the plaintiff of course thereby waived her right to proceed in equity, whether for rescission or otherwise. Nothing in the record before us leaves the slightest doubt on this point. The instructions given, as well as the instructions refused, clearly exclude altogether the contention that the case is in equity, or that there was fraudulent concealment within any recognized rule for the remedy here chosen.

Notwithstanding the sharp cleavage between equity cases and actions at law like the one under review, the majority opinion's discussion of fraud proceeds wholly in relation to a form of fraud sometimes applying in equity. According to a familiar rule, then that discussion is therefore to be considered as mere dictum.

2. Alleged undisclosed insolvency of the Traylor corporation is mentioned in the opinion as if this, of itself, constitutes fraud here. The law is otherwise. 26 C. J. 1194, sec. 100, and cases cited. Nor was alleged undisclosed lack of ownership on the date of the contract either material or relevant. Exhibit 4 expressly provided that delivery of the stocks might be made on finally paying the balance of the purchase price. That balance was never paid. It is idle to speculate whether the plaintiff might have successfully sought rescission and re-

covered the portion already paid, for she deliberately affirmed the contract instead.

3. At all events, the evidence which will appear at the new trial, as applied to and measured by the particular allegations of the complaint itself, must be the determining factor in considering the propriety of any instruction that may then be given or refused. We cannot prejudge the future situation by an academic declaration that such or such constitutes a technically correct or incorrect statement of the law, since it will be the duty of the trial court to declare the law actually applicable to the evidence in the trial then before it. It is presumed that the trial court, in performing that duty, will disregard any mere dictum of this or any other court.

In the light of what I have said above, I need not elaborate on other portions of the majority opinion. Personally, I am convinced that the judgment sustaining the verdict of the jury in the district court should have been affirmed.