573 F.2d 669
 CENTRAL NATIONAL BANK OF CLEVELAND, OHIO, a National Banking
Association, Plaintiff-Appellant.
v.
Carylyn Becker KING and Lloyd R. Wade, as Trustees for the
Sally Ann King Trust# 1, the Carylyn Ann King Trust # 1, the
Mark M. King Trust # 1, and the John M. King IV Trust # 1,
Carylyn Becker King, as Trustee for the Sally Ann King Trust
# 2, the Carylyn Ann King Trust # 2, the Mark M. King Trust
# 2, and the John M. King IV Trust # 2, Defendants-Appellees.
 No. 76-1682.
 United States Court of Appeals,
Tenth Circuit.
 Argued Nov. 16, 1977.
Decided March 30, 1978.
Rehearing Denied April 20, 1978.
 
 Russell P. Rowe, Denver, Colo. (DeMuth & Eiberger, Denver, Colo., on the brief), for plaintiff-appellant.
 Walter A. Steele, Denver, Colo. (White & Steele, P.C., Denver, Colo., on the brief), for defendants-appellees.
 Before McWILLIAMS, BREITENSTEIN and DOYLE, Circuit Judges.
 McWILLIAMS, Circuit Judge.
 
 
 1
 Our disposition of this appeal is governed by Fed.R.Civ.P. 52(a), which provides that findings of fact of a trial court shall not be set aside unless clearly erroneous, and that in determining whether a trial court's findings are, or are not, clearly erroneous an appellate court must give due regard to the opportunity of the trial court to judge the credibility of the witnesses. In our view, the trial court's findings of fact in the instant case are not clearly erroneous, and it is on that basis that we affirm.
 
 
 2
 Although the overriding issue in this case is a simple one, the factual situation out of which the controversy arose is involved, and the testimony relating thereto was, in certain areas, quite conflicting, especially the testimony of two of the principals, Russell Eichman, senior vice-president of the Central National Bank of Cleveland, Ohio, and one John M. King as such pertained to the issue of fraud.
 
 
 3
 During 1968 and 1969, the Central National Bank of Cleveland, Ohio, hereinafter referred to as the Bank, made various personal loans to John M. King. As of August 1970, King was indebted to the Bank in an amount in excess of $3,000,000. Pursuant to the agreement between the Bank and King, the latter was to give the Bank collateral with a value of twice the outstanding balance of his loans. In October 1968, King deposited with the Bank, as collateral, 41,615 shares of stock of the First National Bancorporation of Denver. In August 1970, King sought, and thereafter obtained, a release by the Bank of the Bancorporation stock thus held as collateral. In return for such release, King agreed to pay the Bank $750,000 in cash, to be applied on his indebtedness, and promised to pay an additional $200,000 by the end of February 1971. This agreement was evidenced by a letter from King which was initialed by Eichman. In the meantime, King had negotiated a sale of all of his Bancorporation stock, which included, as well as the 41,615 shares held by the Bank, 9,167 shares held by a Chicago bank, and 6,735 shares which were unencumbered and owned by King outright. King sold his Bancorporation stock, which totaled altogether some 57,517 shares, for a sum of $1,870,612. Breaking down the total amount received by King for all of his Bancorporation stock, King received $1,353,319.80 for the 41,615 shares of stock previously held by the Bank as collateral. Out of this sum, King paid the Bank the agreed sum of $750,000, and placed the proceeds from the sale in excess of that amount in his various checking accounts.
 
 
 4
 Digressing for a moment from our recital of the background facts, it was the Bank's theory of the case that it had been defrauded by King. Specifically, it was the Bank's contention that King had verbally represented to the Bank that it would receive, as payment on King's indebtedness, all of the net proceeds realized by King in the sale of his Bancorporation stock, or at least all of the net proceeds realized by King in the sale of the 41,615 shares of stock previously held by the Bank as collateral, and that King had not paid the Bank all of such net proceeds.
 
 
 5
 In 1966 and 1969, King, as the settlor, had created several trusts for his four children. During the existence of these trusts King had, from time to time, borrowed substantial sums of money, or its equivalent, from these trust funds and would thereafter repay such loans, generally within a relatively short period of time. On September 23, 1970, King deposited the sum of $350,000 from his checking accounts in the trust funds for his children. The present action was brought by the Bank against the trustees of the various trusts previously created by King for his children, seeking to recover the sum of $350,000, which the Bank contends was received by King from the sale of his Bancorporation stock and later deposited in the trusts above referred to.
 
 
 6
 As indicated, it was the Bank's position that King had misrepresented the amount that he, King, was going to receive from the sale of his Bancorporation stock and that it was this misrepresentation that caused the Bank to release the stock to King. Additionally, it is the Bank's position that the trustees of the several children's trusts were themselves privy to King's misrepresentations and knew of them, or should have known of them. The Bank further contends that a portion of the amount received by King from the sale of his Bancorporation stock was illegally diverted by King to his children's trust funds without consideration therefor. It was on this basis that the Bank brought suit, not against King, but against the trustees of the children's trust funds, on the theory that it was entitled to a constructive trust or equitable lien on the $350,000 which the Bank claimed was realized by King for the sale of the Bancorporation stock and which could be traced into the trust funds.
 
 
 7
 Trial of this case was to the court, sitting without a jury, and was a protracted one, taking some five days to try. Much testimony was taken, and some 162 exhibits were received into evidence. No complaint is made here that the trial court rejected any proffered evidence. The trial court, after taking the case under advisement, later made detailed findings in open court, with counsel for both sides present. The trial court's findings are in supplemental volume VI of the record on appeal, and the transcript of such findings consists of 53 pages of typewritten material, double-spaced. Suffice it to say, the trial court's findings are commendably specific, and not general. Fed.R.Civ.P. 52(a). The basic issue raised on appeal is that the trial court's findings are "wrong" in that they are not supported by credible evidence. That is not our view of the matter.
 
 
 8
 As indicated, the Bank's burden in the present case was a heavy one. It was the Bank's burden to establish by a preponderance of the evidence that King made fraudulent representations to the Bank which the Bank relied on in releasing the Bancorporation stock to King; that the trustees of the various children's trusts were in privy with King in connection with the latter's misrepresentations to the Bank; that a portion of the proceeds from the sale of this stock could be traced directly into the trust funds; and that assuming there could be such a tracing of particular monies into the fund, such were without consideration and represented additions to the trust corpus. On each of these issues, the trial court found against the Bank and in favor of the trustees, not in general terms, but with specific findings on each of the several related matters.
 
 
 9
 Our study of the record leads us to conclude that the critical findings of the trial court are supported by the record and certainly cannot be characterized as clearly erroneous. We do not propose to list all the findings of the trial court, and then point out the supporting evidence by chapter and verse. One such reference will serve to illustrate.
 
 
 10
 Perhaps the most critical issue is whether King made false representations to Eichman, the senior vice-president of the Bank and the official with whom King primarily dealt. On this pivotal issue, the testimony of Eichman and King was in sharp conflict. Eichman testified on direct examination that, based on his two telephone conversations with King, it was his definite understanding that King was receiving from the sale of the 41,615 shares of Bancorporation stock a sum slightly less than one million dollars, net, and that it was on this basis that the Bank agreed to release the 41,615 shares in return for King's immediate payment of $750,000 in cash and his promise to pay an additional $200,000 no later than the end of February 1971. Eichman also testified that if he had known that King was going to receive $1,353,319.80 for the 41,615 shares of stock, which is the sum King did in fact receive, there would have been "more conversation."
 
 
 11
 King's testimony on this critical matter was at odds with Eichman's testimony. King testified that he did not advise Eichman of the exact price he was going to receive from the sale of the stock, and, more specifically, King categorically denied that he ever told Eichman that the Bank would get the entire net proceeds from the sale of the 41,615 shares of Bancorporation stock. Rather, according to King, his understanding with the Bank was correctly set forth in his letter, which was a follow-up to his two telephone conversations with Eichman. King's letter, as referred to above, stated that in return for the Bank's release of the stock King would pay the Bank at once the sum of $750,000, and would pay an additional $200,000 no later than February 1971. The letter was an exhibit in the case and had been initialed by Eichman.
 
 
 12
 In this Court, counsel asserts that King's testimony was not credible, and would make much of alleged inconsistencies between King's testimony and deposition. Opposing counsel in turn attempts to show that Eichman himself was not entirely consistent in his testimony. Be that as it may, it still boils down to a question of credibility. The trial judge, for reasons which he clearly articulated, chose to adopt King's version of events. And this, under the circumstances, was a prerogative of the trial judge.
 
 
 13
 The finding by the trial court that King made no false or fraudulent representations to the Bank is in practical effect a death knell to the Bank's claim. But the trial court did not stop there. The trial court further found that the Bank, in releasing the shares of stock to King, did not rely on any general statements which may have been made by King as to what price he was going to receive for his stock. In this regard, the trial court found that the bid-ask price for Bancorporation stock was generally known and that the Bank either knew or should have known that the Bancorporation stock was selling at somewhere between $30 and $35 per share.
 
 
 14
 Furthermore, the trial court found that the trustees of the several children's trusts were not in privy with King in any of his negotiations with the Bank for the release of the stock, or with Bruce Paul, who eventually purchased the stock from King. In this regard, it should be noted that though King is presently a successor co-trustee of one of the children's trusts, King was not a trustee at the time of the transactions which are here under attack. King's wife, Carylyn King, from whom he is now divorced, was a trustee, but there is absolutely nothing in the record to show that she was in anywise aiding or abetting, or even had knowledge of, any of King's dealings with the Bank. And the trial court specifically found such to be the fact.
 
 
 15
 The trial court also found that the Bank had failed to show that any excess money received by King from the sale of his stock, i. e., in excess of the $750,000 which he paid the Bank, could be traced into any of the trust funds. The excess was traced into King's checking accounts, but whether any of those particular monies were later transferred into the children's trust funds is uncertain. Deposits and withdrawals from King's checking accounts were both frequent and substantial.
 
 
 16
 As concerns the admitted payment by King to the trust funds on September 23, 1970, the trial court found that such was a repayment of loans previously made King by the trustees. Over the years King had frequently borrowed from the trust funds on generally a 30-day basis, which loans King repaid promptly, and with interest. As indicated, in this regard the trial court specifically found that King was repaying an obligation to the trust funds and that the payment of September 23 did not represent any increase in the trust corpus.
 
 
 17
 It should be apparent, by now, that this Court is thoroughly convinced that the issues in this case are issues of fact, and not issues of law. For example, the Colorado law on the necessary elements to establish fraud are the traditional ones and are well established and not subject to dispute. Morrison v. Goodspeed, 100 Colo. 470, 68 P.2d 458 (1937). Not only must fraud be pleaded with particularity, it must be established upon trial by clear and convincing evidence. Wiley v. Byrd, 158 Colo. 479, 408 P.2d 72 (1965). This, the trial court held, the Bank had failed to do.
 
 
 18
 In our view the state of the record is such that the trial court could have found for the Bank, but it was not bound to so find. On balance, we have no "definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). On the contrary, the trial court has merely resolved a disputed issue of fact based on conflicting evidence.
 
 
 19
 Judgment affirmed.