* Justice HOBBS would grant on the following issue:
 Whether the court of appeals erred in deciding an issue of first impression, by ruling that a

cle theft and specifying that defendant is subject to discretionary parole.

Judge NIETO and Judge PLANK * concur.

William K. COORS, individually, Plaintiff–Appellee and Cross–Appellant,

v.

SECURITY LIFE OF DENVER INSURANCE COMPANY, a registered domestic insurance corporation, Defendant–Appellant and Cross–Appellee.

No. 02CA0851.

Colorado Court of Appeals, Div. IV.

Aug. 28, 2003.

Certiorari Granted May 24, 2004.*

violation of Colorado's Unfair Competition–Deceptive Practice Act, which defines and makes illegal specific unfair trade practices by the insurance industry, does not constitute a *per se* violation of the Colorado Consumer Protection Act.

Podoll & Podoll, P.C., Richard B. Podoll, Greenwood Village, Colorado, for Plaintiff–Appellee and Cross–Appellant.

Wheeler, Trigg & Kennedy, P.C., John M. Vaught, Heather J. Shull, Denver, Colorado, for Defendant–Appellant and Cross–Appellee.

Johnson & Ayd, P.C., James D. Johnson, Denver, Colorado, Amicus Curiae for Colorado Defense Lawyers Association.

Roberts, Levin & Patterson, P.C., Bradley A. Levin, Christine K. Wilkinson, Denver, Colorado, Amicus Curiae for Colorado Trial Lawyers Association.

Opinion by Judge GRAHAM.

Defendant, Security Life of Denver Insurance Company, appeals from the judgment entered against it and in favor of plaintiff, William K. Coors. Coors also cross-appeals a portion of the judgment. We affirm in part, reverse in part, and remand.

On December 8, 1994, Coors, accompanied by his attorney, met with an insurance agent to purchase life insurance. Coors and his attorney reviewed sales illustrations for a Security Life Ultra UL policy with a death benefit of $5.2 million and a projected annual premium of $331,871. The illustrations applied to a seventy-eight-year-old male, nonsmoker. The expense charge term is based upon actuarial computation, which varies depending on age, gender, and smoking status. The expense term was never discussed in the negotiations and is used in calculating the cash surrender value of the policy. Coors signed an application for an Ultra UL policy with the illustrated death benefit and projected annual premium and tendered a check for the first premium of the policy.

The policy became effective on December 15, 1994. It provided that the monthly expense charges were $7.00 per policy per month in all years and $.131 per $1,000 of basic death benefit per month during the first five years of the policy. The policy also contained a face page dated December 15, 1994, which provided Coors a twenty-day right to review and return the policy once he had initially accepted it. When Coors received the policy, he never reviewed it because he "assumed that it was what [he] had bargained for."

Security Life then sent Coors a disclosure statement that stated that the monthly expense charges were $7.00 per policy per month in all years and $.90 per $1,000 of basic death benefit per month during the first five policy years. Coors did not review the disclosure statement.

Each month for approximately three and one-half years, Security Life charged $.90 per $1,000 of basic death benefit, or $2340 per month, to Coors's policy. Thus, the cash surrender value was diminished. Although Coors received annual statements in 1995, 1996, and 1997 that reflected the total expense charges deducted each year based on a $.90 expense charge, he did not review them. Coors paid the $331,871 premium every year from 1994 to 1997.

Security Life did not notice that Coors's policy erroneously provided for a $.131 expense charge until February 1997. In October 1997, Security Life learned that a "computer truncation error" had mistakenly printed the $.131 expense charge on 227 UL Ultra policies, including Coors's policy. Security Life's general counsel concluded that the misprint was a scrivener's error, which could be reformed.

In spring 1998, Coors's estate planning attorney asked Coors's insurance agent whether the $.90 expense charge term was guaranteed. After verifying the information with a claims representative of Security Life, a representative of the insurance agency wrote a letter to Coors's attorney stating that the expense charge term was $.131 per thousand of basic coverage and that it was guaranteed and not subject to change. The insurance agency representative testified that she did not know what documents Security Life relied upon when it verified the policy information; she did not know that there was a discrepancy between the policy and the disclosure statement; and she did not alert Security Life to the discrepancy.

In June 1998, Security Life drafted a letter to Coors notifying him of the error (the June letter). Security Life enclosed a new schedule page reflecting the $.90 expense charge and also enclosed a new policy face page that contained the same twenty-day review provision and date as the original face page.

Coors received the letter in July 1998, and on the same day he requested a rescission of his policy and demanded a refund of all premiums paid, with interest, from the inception of the policy. Security Life informed Coors that the June letter neither required action on his part nor triggered a new twenty-day review period. Security Life explained to Coors that the new face page containing the twenty-day review provision was identical to the face page issued with the policy in 1994, although the signatures on the two face pages differed.

Coors then requested a surrender of his policy and demanded payment. Security Life issued Coors a check for $667,025.03, which represented the surrender value of his policy—the account value less a termination penalty of $112,762.19.

Coors filed an action against Security Life for breach of contract, bad faith breach of contract, fraud, violation of the Colorado Consumer Protection Act (CCPA), § 6–1–101, et seq., C.R.S.2002, and punitive damages. After a bench trial, the court ruled in favor of him on all counts and awarded Coors $1,085,506.73 in total damages, which included treble damages and attorney fees. This appeal followed.

## I. CCPA

Security Life contends that the trial court erred in finding that its conduct constituted a violation of the CCPA. We agree.

■ Findings of fact are reviewed for clear error or abuse of discretion, whereas conclusions of law generally are reviewed de novo. *E–470 Pub. Highway Auth. v. 455 Co.*, 3 P.3d 18 (Colo.2000). We must accept the trial court's findings on review unless they are so clearly erroneous as not to find support in the record. *Bainbridge, Inc. v. Bd. of County Comm'rs*, 53 P.3d 646 (Colo.App. 2001).

■ We are mindful of the instruction provided in *Stevens v. Humana of Delaware, Inc.*, 832 P.2d 1076 (Colo.App.1992), and *Municipal Subdistrict v. OXY USA, Inc.*, 990 P.2d 701 (Colo.1999), that the near wholesale adoption of one party's proposed findings of fact and conclusions of law requires this court to give close scrutiny to those findings and conclusions. Because the trial court adopted nearly all of Coors's proposed order, we therefore closely scrutinize its findings and conclusions here.

■ The CCPA is a remedial statute intended to deter and punish deceptive trade practices committed by businesses in dealing with the public. *Showpiece Homes Corp. v. Assurance Co.*, 38 P.3d 47 (Colo.2001). The CCPA's broad legislative purpose is "to provide prompt, economical, and readily available remedies against consumer fraud." *W. Food Plan, Inc. v. Dist. Court*, 198 Colo. 251, 256, 598 P.2d 1038, 1041 (1979). The statute provides both for enforcement by the attorney general and for a private right of action by any person injured by the deceptive acts or practices committed by a business. *Showpiece Homes Corp. v. Assurance Co., supra.*

■ To prove a private cause of action under the CCPA, a plaintiff must show that: (1) the defendant engaged in an unfair or deceptive trade practice; (2) the challenged practice occurred in the course of the defendant's business, vocation, or occupation; (3) the challenged practice significantly impacts the public as actual or potential consumers of the defendant's goods, services, or property; (4) the plaintiff suffered injury in fact to a legally protected interest; and (5) the challenged practice caused the plaintiff's injury. *Hall v. Walter*, 969 P.2d 224, 235 (Colo.1998).

■ The terms of the CCPA must be given a liberal construction to effectuate its broad purpose and scope. *Hall v. Walter, supra.* Thus, in determining whether conduct falls within the purview of the CCPA, courts presume that the CCPA applies to the conduct. *Showpiece Homes Corp. v. Assurance Co., supra.*

The trial court found that Security Life engaged in unfair or deceptive trade practices by: (1) stating in its June letter to Coors that "the values of your policy have always been accurately calculated and reported on your annual statements"; (2) deducting $2340 per month from Coors's cash surrender account instead of $340.60; (3) billing Coors in December 1997 for a premium that it knew in October 1997 was falsely calculated based on an inaccurate expense charge factor; (4) publishing Coors's annual statements containing false and misleading information concerning the value of the policy based upon the inaccurate expense charge; (5) providing Coors a twenty-day right to review the policy provision while never intending to honor it; (6) failing to clarify false and misleading statements with respect to the expense charge factor when it knew in November 1997 that such statements were false; (7) stating in its June letter that all the illustrations and cost disclosures presented during the sales process were correct; (8) implementing a false and misleading scheme to unilaterally change 227 policies and to avoid its obligation to refund $21.7 million to affected policyholders; (9) making false representations to policyholders regard-

ing the effect of the computer truncation error; (10) expressly guaranteeing to Coors that his expense charge term was $.131 and not subject to change, and then expressly disavowing its guarantee; and (11) warranting that the premiums were accurately calculated in bills, statements, annual reports, and illustrations.

The trial court concluded that these actions violated § 6–1–105(1)(e), (*l*), and (r) of the CCPA and found that Coors paid excessive expense charges from December 15, 1997, through the remaining term of his policy. The court also held that the purpose of the false and misleading statements was to deceive Coors into believing that his insurance cost $2,000 more per month than it actually did. Finally, the trial court noted that the challenged practices occurred in the course of Security Life's business and had "the potential to significantly impact the public as actual or potential consumers of insurance."

### A. Lack of Public Impact

We leave for another day the question whether the trial court's findings regarding Security Life's conduct reflect the type of unfair or deceptive trade practice contemplated by the CCPA. Instead, here we conclude that public impact was not proven as a matter of law.

■ Relevant considerations in determining whether a challenged practice significantly impacts the public within the context of a CCPA claim include: (1) the number of consumers directly affected by the challenged practice; (2) the relative sophistication and bargaining power of the consumers affected by the challenged practice; and (3) evidence that the challenged practice has previously affected other consumers or has the significant potential to do so in the future. *Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.*, 62 P.3d 142 (Colo.2003).

■ Although Coors presented evidence that Security Life sent approximately 200 out of 20,000 policyholders similar June letters regarding the computer error, there was no more evidence before the trial court regarding the other policyholders. Nor did the

trial court make specific or detailed findings about how the public might have been impacted by Security Life's actions; it made only a cursory conclusion that Security Life's actions "had the potential to significantly impact the public as actual or potential consumers of insurance." Depending on the ages and smoking status of the of the other policyholders, the expense charge could have been de minimis. Furthermore, the court never determined whether 200 affected policyholders out of 20,000 represents a sufficient segment of the public to warrant a conclusion that Security Life's acts significantly impacted the public, and we conclude that an impact on at most one percent of the policyholders could not constitute public impact.

In addition to the challenged conduct being private in nature, Coors was a sophisticated businessman and was accompanied by counsel during the sales process for the policy. The situation of the other policyholders in this regard is unknown.

For these reasons, we conclude that there was no substantial evidence of significant public impact in this case. Accordingly, the judgment on the CCPA claim must be reversed.

### B. Lack of Per Se Violation

We also agree with Security Life's contention that the trial court erred in concluding that a violation of the Colorado Unfair Claims–Deceptive Practices Act (UCDPA) constitutes a deceptive trade practice under § 6–1–105(1) and is therefore a per se violation of the CCPA.

The trial court found that Security Life violated the UCDPA, § 10–3–1104(1)(a)(I) and (VI), C.R.S.2002, by adopting a false and misleading scheme to induce Coors to accept a unilateral change to his express insurance policy, denying Coors a refund for his charges, and charging Coors a termination fee. The trial court concluded that, because "the UCDPA is to work in tandem with the CCPA, a violation of the express terms of the UCDPA must be construed as a violation of the CCPA." It also held that Security Life engaged in unfair or deceptive trade prac-

tices by violating the provisions of the UCDPA.

The UCDPA regulates unfair or deceptive trade practices in the insurance industry. *Showpiece Homes Corp. v. Assurance Co., supra.* The legislative purpose of the UCDPA is "to regulate trade practices in the business of insurance by defining, or providing for the determination of, all such practices in this state which constitute unfair methods of competition or unfair or deceptive acts or practices, and by prohibiting the trade practices so defined or determined." Section 10-3-1101, C.R.S.2002.

 The UCDPA vests the insurance commissioner with power to investigate specifically defined acts and practices of insurers and to enforce regulatory penalties, such as limited monetary penalties and the suspension or revocation of licenses. Section 10-3-1108, C.R.S.2002. However, unlike the CCPA, no private right of action may be maintained under the UCDPA. Section 10-3-1114, C.R.S.2002; *Schnacker v. State Farm Mut. Auto. Ins. Co.,* 843 P.2d 102 (Colo.App.1992); *Farmers Group, Inc. v. Trimble,* 658 P.2d 1370 (Colo.App.1982), *aff'd,* 691 P.2d 1138 (Colo.1984).

Although Coors did not, and had no right to, bring a cause of action under the UCDPA, the trial court nevertheless concluded that Security Life violated specific provisions of the UCDPA and that such violation constituted a deceptive trade practice under § 6-1-105 of the CCPA.

The version of § 6-1-113(1) of the CCPA that was in force at the time of the alleged conduct provided that "The provisions of this article shall be available in a civil action for any claim against any person who has engaged in ... any deceptive trade practice listed in section 6-1-105 or 6-1-105.5." Colo. Sess. Laws 1987, ch. 42 at 360. Section 6-1-113(1), C.R.S.2002, as amended in 1999, now provides that "The provisions of this article shall be available in a civil action for any claim against any person who has engaged in ... any deceptive trade practice listed in this article."

 Our primary task in construing a statute is to ascertain and give effect to the intent of the General Assembly. To discern legislative intent, a court should look first to the statutory language. Statutory words and phrases should be given their plain and ordinary meaning. *Town of Parker v. Colo. Div. of Parks & Outdoor Recreation,* 860 P.2d 584 (Colo.App.1993).

 According to the plain language of the relevant version of the statute, a deceptive trade practice includes only those acts identified in § 6-1-105. In *Hall v. Walter, supra,* the supreme court stated that the first step in proving a CCPA claim "requires the plaintiff to establish conduct by the defendant that constitutes a deceptive trade practice." *Hall v. Walter, supra,* 969 P.2d at 234. The court specifically referenced § 6-1-105 as "identifying and defining deceptive trade practices." *Hall v. Walter, supra,* 969 P.2d at 234.

We reject Coors's argument that § 6-1-105(3), C.R.S.2002, recognizes that there may be unfair trade practices actionable under the CCPA which are not specifically enumerated in § 6-1-105(1). Section 6-1-105(3) states that the "deceptive trade practices listed in this section are in addition to and do not limit the types of unfair trade practices actionable at common law or under other statutes of this state." The plain language of the statute expresses that, although an action brought under the CCPA must be for a deceptive trade practice expressly enumerated in § 6-1-105(1), conduct not expressly enumerated in § 6-1-105(1) may be actionable as an unfair trade practice under a different legal theory or statute, including an action brought by the insurance commissioner under the UCDPA. *See Lexton–Ancira Real Estate Fund, 1972 v. Heller,* 826 P.2d 819, 825 (Colo.1992)(the language in § 6-1-105(3) "does not preclude claimants from bringing other causes of action").

Coors also relies on *Showpiece Homes* for the proposition that the list of deceptive trade practices enumerated in § 6-1-105(1) is not exhaustive. In *Showpiece Homes,* the supreme court answered four abstract legal questions certified by the United States District Court pursuant to C.A.R. 21.1:(1) whether a private cause of action by an insured

against an insurer under the CCPA is preempted by the UCDPA; (2) whether the insurance industry is excluded from the provisions of the CCPA; (3) whether insurance encompasses the sale of goods, services, or property under the CCPA; and (4) whether the CCPA applies to an insurer's postsale unfair or bad faith conduct. The court answered the first two questions in the negative and the last two questions in the affirmative.

In so holding, the supreme court noted that the "CCPA is meant to work in tandem with other regulatory provisions in the Colorado statutes, and as such, works in conjunction with, not to the exclusion of, the UCDPA." *Showpiece Homes Corp. v. Assurance Co., supra,* 38 P.3d at 49. The court reasoned that:

> The CCPA does not list all the industries to which it applies, nor does it specify all the types of transactions it covers. In enacting the statute, the General Assembly could not have possibly enumerated all, or even most, of the practices that the CCPA was intended to cover. *See FTC v. Sperry & Hutchinson Co.,* 405 U.S. 233, 240, 92 S.Ct. 898, 31 L.Ed.2d 170 (1972)("It is impossible to frame definitions which embrace all unfair practices. There is no limit to human inventiveness in this field. Even if all known unfair practices were specifically defined and prohibited, it would be at once necessary to begin over again.... [I]t would undertake an endless task."). Instead, the General Assembly focused on prohibiting, in very general terms, those actions that are likely to injure the public. If we were to decide that the only practices covered are those specifically listed in the act, we would be severely hindering the CCPA's broad remedial power. We find that the list in section 6–1–105 is not exhaustive and because deceptive or unfair practices in the business of insurance could clearly injure the public they are within the purview of the CCPA.

*Showpiece Homes Corp. v. Assurance Co., supra,* 38 P.3d at 54.

Contrary to Coors's contention, *Showpiece Homes* did not hold that other conduct not enumerated in § 6–1–105 may constitute a deceptive trade practice under the CCPA.

Furthermore, the quoted reasoning concerned the question of whether insurance companies and insurance transactions are within the purview of the CCPA even though they are not specifically mentioned in § 6–1–105 and are regulated by the state with rules and guidelines which bar deceptive conduct not necessarily enumerated in the CCPA. Thus, in our view, the holding in *Showpiece Homes* is limited to the conclusion that insurance companies and insurance transactions will be covered by the CCPA if the requirements of *Hall* are met.

There is also no language in the CCPA providing that a UCDPA violation constitutes a per se violation of the CCPA. In our view, *Showpiece Homes* does not overrule the holding in *Hall* that the first step in proving a CCPA claim requires the plaintiff to establish conduct by the defendant that constitutes a deceptive trade practice identified in § 6–1–105. Nor does Showpiece Homes overrule the other four requirements set forth in *Hall.*

Accordingly, we conclude that Security Life did not violate the CCPA.

## II. Reformation

Security Life next contends that the trial court erred in finding that it was not entitled to reformation because the computer truncation error was a unilateral mistake made by Security Life. We disagree.

The trial court concluded that:

Coors had nothing to do with the Computer Truncation Error. Coors could not have known what expense charge Security Life may have intended to charge him. The expense charge term was a profit component of the policy. It was determined during the pricing process of the policy. There is no evidence in this case that Security Life was willing to share information in regard to its profit. Since Coors had no knowledge of the $.90 expense charge, there could be no agreement to it.... [T]he sales illustrations do not mention the expense charge term. Coors could not derive the $.90 expense charge term from the illustrations.

The court reasoned that Security Life sought to change the expense charge term

"not to reflect what was actually agreed to," but "to reflect what it intended to include in the policy, but did not."

The trial court held that the expense charge term was not a standard term of the policy, but a profit component that varied by age, gender, and smoking status. The court found that the evidence demonstrated that, although Security Life had a table that reflected the expense charge it intended to charge, it did not use this table in preparing Coors's policy, and instead calculated the expense charge term and made a mistake in performing this calculation. The court concluded that Security Life's computer truncation error was a unilateral error which could not be reformed.

While scrivener's errors may be reformed as mutual mistakes, we recognize that the trial court is in the best position to determine the equitable right to reformation, and we therefore affirm the trial court's ruling barring reformation. Where scrivener's errors occur, the error may be a mutual mistake because both parties erroneously conclude that the document they signed is correct. *Hanes v. Roosevelt Nat'l Life Ins. Co.*, 116 Ill.App.3d 411, 72 Ill.Dec. 232, 452 N.E.2d 357 (1983). Thus, reformation was an appropriate remedy for Security Life to pursue, but the remedy is foreclosed if the party seeking it is not entitled to equity. *See Salzman v. Bachrach*, 996 P.2d 1263 (Colo. 2000). Thus, the trial court acted within its discretion in finding that Security Life violated a regulatory provision under the UCDPA and thereby forfeited its right to seek reformation. The trial court was in the best position to balance the relative equities, and we will not disturb its judgment.

### III. Breach of Contract

Security Life contends that the trial court erred in finding that it breached its promise to use a $.131 expense charge. We disagree.

### A. Overcharge

We first agree with the trial court that Security Life's use of the $.90 expense charge constituted a material breach.

To prevail on a claim for breach of contract, a party must show a contract was in existence and that the other party failed to perform some term of the contract. *Spencer Invs., Inc. v. Bohn*, 923 P.2d 140 (Colo.App. 1995). The interpretation of a contract is a question of law that we review de novo. *Rocky Mountain Health Maint. Org., Inc. v. Colo. Dep't of Health Care Policy & Fin.*, 54 P.3d 913 (Colo.App.2001).

Whether a party has substantially performed under a contract necessarily turns on whether that party has materially breached the contract because material breach renders substantial performance impossible. Whether there has been a material breach is a question of fact. *Interbank Invs., L.L.C. v. Vail Valley Consol. Water Dist.*, 12 P.3d 1224 (Colo.App.2000). Thus, we may disturb the trial court's finding only if it is clearly erroneous and not supported by the record.

In determining whether a breach is material, the trier of fact should consider whether the injured party received substantial benefit and the adequacy of compensation in damages for the breach. *Kaiser v. Mkt. Square Disc. Liquors, Inc.*, 992 P.2d 636 (Colo.App.1999).

Although the expense charge was not negotiated, it nevertheless became a term in the contract, thereby obligating Security Life to burden the policy with a charge of $.131 per $1,000 of premium. Where obligations under a contract are material, neither party is excused "from complete performance until each has tendered performance as obligated under the contract and demanded performance of the other." *Harris v. Hanson*, 821 P.2d 821, 822 (Colo.App.1991). Although Security Life may have performed the central purpose of the agreement by insuring Coors's life, it was not discharged from complying with other contract terms. Thus, the trial court was correct in determining that a material breach occurred. *See, e.g., Osteen v. Johnson*, 473 P.2d 184 (Colo.App.1970)(not published pursuant to C.A.R. 35(f)). The trial court also found that the proper measure of damages was $89,973, representing

the added cash value of the account if Security Life had used the $.131 expense charge.

### B. Termination Penalty

■ However, we conclude that the trial court erred in holding that Security Life was not entitled to a termination penalty upon Coors tendering his policy.

The record discloses that, at all times pertinent, a valid contract of life insurance for $5.2 million was in place, obligating Security Life to pay the face amount of the policy in the event of Coors's death. Security Life serviced the policy and collected annual premiums.

The court found that the expense charge overcharge had a "material impact" upon the performance of the policy. Inconsistently, the trial court found, with record support, that it would be inappropriate for Coors to receive "3½ years of free insurance" and that "Security Life has in fact conferred some benefit on [Coors] by providing insurance for the term in which the policy was in effect." The trial court cited *Torke v. Federal Deposit Insurance Corp.*, 761 F.Supp. 754, 757 (D.Colo.1991), for the proposition that "[a] party to a contract cannot claim its benefits where he is the first to violate its terms." In fact, *Torke* is a *D'oench* doctrine case involving FDIC rules and regulations. The proposition relied upon by the trial court, expressed as dicta in *Torke*, is actually based on the notion that a party who is in breach may not maintain an action against the other party for failure to perform. *Navato v. Sletten*, 560 F.2d 340 (8th Cir.1977). This principle is based upon the equitable principle of estoppel. If, as the trial court held, Security Life is not barred from keeping the premiums under the policy, there is no justification for barring it from invoking the forfeiture provisions upon early termination which Coors promised to pay. The trial court did not reconcile this inconsistency, and there is no record support for it.

Thus, the trial court erred in refusing to allow Security Life to keep the agreed termination fee, and that portion of the judgment must be reversed.

### C. Twenty–Day Right of Review

■ We next determine that the twenty-day right of review language in the replacement face sheet of the June letter did not create a new contract, and the trial court erred in concluding otherwise. Thus, this language did not allow Coors a new twenty-day period in which to rescind the policy.

The replacement face page was the same as the original face page sent and had the same date—December 15, 1994.

The trial court determined that the language on the face sheet created a new and separate contract "that gives the policyholder the right to refund of premiums paid after receipt of the new 20 day right to examine notice." The trial court found that Security Life printed the new face page as part of a "scheme" to "unilaterally change the policy," and "included [it] with the June ... letter for the purpose of providing Security Life with a regulatory or market conduct compliance explanation in the event of an investigation."

The record, however, indicates that Security Life did not intend for this face page to create a new twenty-day right to review, but instead sent the face page to assist Coors in locating the correct policy. This intent is evidenced by a later, July 1998 letter to Coors explaining that the June letter "did not require any action on his part nor trigger a twenty day review period for which Mr. Coors would need to take any action."

Nothing in the record supports the trial court's finding that a valid agreement created a new twenty-day right to review the existing 1994 policy. If Security Life sent the new face sheet as an attempt to satisfy a regulatory inquiry, it did not constitute a valid offer because there was no intent to enter a contract. In contrast, if Security Life sent the face page as an offer to "unilaterally change the contract," Coors rejected that offer when he tendered the policy for a refund. Thus, there is no evidence that Security Life offered, and Coors accepted, an opportunity essentially to rescind the policy and be repaid the premiums.

Accordingly, when Coors chose to surrender his policy, Security Life properly paid him the surrender value minus the termi-

nation fee in compliance with the policy provisions.

Because we have determined that Coors was not entitled to a new twenty-day right to review his policy in 1998, we need not address Coors's argument on cross-appeal that he was entitled to a refund of all premiums paid from the inception of the policy.

## IV. Fraud

We find no error in the court's determination that Security Life's conduct with respect to the 1997 premium payment constituted fraud by omission.

One commits fraud when he makes a false representation of a material existing fact, knowing that it is false, with intent that it be acted upon, and the person to whom the representation is made, in ignorance of the truth, relies upon the misrepresentation. *Morrison v. Goodspeed*, 100 Colo. 470, 68 P.2d 458 (1937). One may also commit fraud by concealing material existing facts that in equity and good conscience ought to be revealed. *Morrison v. Goodspeed, supra.* Of course, the representation or concealment must result in damages. *Brody v. Bock*, 897 P.2d 769 (Colo.1995).

Here, the findings are contradictory, but nevertheless support the finding of fraud. The trial court found that Security Life concealed its intent not "to abide by the express terms of [Coors's] insurance policy" and also concealed its overcharge of expense charges from the inception of the policy. The court further found that "Coors paid his December, 1997 premium in the amount of $331,871 in reliance upon his belief that Security Life had abided by, and would abide by, the express terms of the insurance contract."

The damages were found to be "overpayment of expense charges from December 15, 1997 (the date Security Life continued to charge him an inaccurate premium knowing it factored in an excessive expense charge) [through the date of termination] together with interest." The court found that Coors was "further damaged by having paid a termination penalty which he should not have paid." The court also found fraud in Security Life refusing to allow Coors to terminate

the policy under the twenty-day right to review provision on the substitute face page.

The court did not calculate damages, but noted that they would not include the premium paid in December 1997 because Coors "received the benefit of the policy coverages." The court relied on other damages awarded under the breach of contract and other claims, which also did not include the December 1997 premium.

Although it is apparent that Coors received a disclosure of the $.90 per $1,000 of premium charge, the annual statements he received did not repeat that disclosure. Although Security Life accurately disclosed the actual charges, a review would not have revealed the amount of the expense charge used unless one were to do mathematical computations, because the annual reports simply included expense totals. And, although Coors's counsel was easily able to determine that the charge was $.90, this did not occur until spring 1998. Further, even though Security Life may have been entitled to pursue a reformation claim, it chose not do so, at least initially. Rather than seek reformation relief by way of a request for a declaratory judgment, it chose to pursue a course that the trial court determined did not comport with equity and good conscience.

In accordance with our other conclusions herein, Coors was not damaged by payment of a termination fee or by Security Life's refusal to allow him to terminate under the twenty-day right to review provision. Thus, the damages for Security Life's fraudulent concealment are limited to the excess expense charges from December 1997 to the date of termination, and to the extent that those damages are not already included in the award for breach of contract, they should be added to that award, together with interest.

## V. Punitive Damages and Attorney Fees

Finally, in light of our conclusions herein, we determine that there is no basis for awarding punitive damages.

Close review of the trial court's findings and conclusions indicates that, although the court commented that certain conduct might

warrant the imposition of punitive damages, it actually awarded treble damages in accordance with the CCPA. The trial court stated:

> [B]ecause Security Life has violated several provisions of the [CCPA], Coors will be awarded treble damages, costs and attorneys' fees.... The purpose of the punitive damage statute would be well served by the imposition of punitive damages against Security Life in this case.... Because treble damages will be awarded to Coors under his CCPA claims, an award of treble punitive damages would be duplicative. Treble punitive damages, however, would be appropriate under the facts and circumstances of this case.... Notwithstanding its conduct in the course of discovery, the deceptive trade practices Security Life engaged in ... standing alone, support an award of treble punitive damages pursuant to C.R.S. 13–21–102(3)(b).

In light of our ruling regarding the CCPA violations, the treble damage award must be reversed.

Moreover, to the extent that punitive damages are intended to be a sanction for a discovery violation, nothing in the record supports a sanction of this magnitude. The trial court made no findings regarding discovery violations in its findings of fact and conclusions of law. The award of punitive damages and attorney fees is reversed and vacated.

The judgment is reversed as to the CCPA claim and as to the awards for the termination penalty, treble damages, punitive damages, and attorney fees. In all other respects, the judgment is affirmed. The case is remanded to the trial court for such further proceedings as may be necessary to enter an amended judgment consistent with this opinion.

Judge NIETO and Judge RULAND ** concur.

** Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and